IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CASSANDRA KINCAID,

                    Plaintiff,

v.                                                      Case No. 21-2059-DDC-TJJ

UNIFIED SCHOOL DISTRICT NO. 500,
KANSAS CITY, KANSAS,

                    Defendant.

_____

## MEMORANDUM AND ORDER

Plaintiff Cassandra Kincaid accuses defendant Unified School District No. 500 of harassment and retaliation against her in violation of Title VII and Title IX. Before the court is defendant's Motion for Summary Judgment under Fed. R. Civ. P. 56 (Doc. 48) and supporting memorandum (Doc. 49). Plaintiff has responded (Doc. 61). And defendant has replied (Doc. 74). For reasons described below, the court grants defendant's summary judgment motion.

Also before the court is plaintiff's Motion to Amend or Modify the Pretrial Order (Doc. 59) and supporting memorandum (Doc. 60), defendant's opposing memorandum (Doc. 69) and plaintiff's reply (Doc. 73). The court also denies this motion (Doc. 59), as explained below.

Finally, defendant's Supplement to Memorandum in Support of Motion for Summary Judgment (Doc. 78) asks the court to find as a matter of law that plaintiff cannot recover any emotional distress damages under Title IX after the recent Supreme Court decision, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1572 (2022). Plaintiff responded (Doc. 79). The court finds that it need not reach this issue after granting summary judgment on Title IX liability.

I.     **Background**

The following facts are uncontroverted or, where controverted, are stated in the light most favorable to plaintiff, the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Defendant USD No. 500 employs plaintiff as assistant principal at Central Middle School. Doc. 43 at 2 (Pretrial Order ¶ 2.a.1.). Dr. Fred Skretta served as the principal at Central Middle School for about three years—from the Fall 2018 to Spring 2021. Doc. 49-22 at 2 (Skretta Dep. 10:18–21). The allegations of retaliation center on plaintiff reporting a special education student for sexually assaulting another student, and what plaintiff perceives as harassment and retaliation from Principal Skretta and the school district following her report. The facts in this case fall into two categories: (a) the events surrounding plaintiff reporting a student sexual assault and Principal Skretta's subsequent reprimand—a formal letter of concern—and his behavior toward plaintiff; and (b) defendant's hiring process for elementary school principals including its decision not to hire plaintiff.

### *Supervision of Special Education Program at Central Middle School*

At Central Middle School, only Principal Skretta and the two assistant principals—plaintiff and Ms. Estes—had authority to discipline students. *Id.* at 41–42 (Skretta Dep. 192:5–193:20). On March 7, 2019, Principal Skretta emailed the two assistant principals in an effort to monitor discipline of special education students. *Id.* at 41–42 (Skretta Dep. 192:5–193:20). Principal Skretta informed his assistant principals that he would take over all supervision of Central Middle School's special education services for the rest of the school year. Doc. 49-68 at 11 (Kincaid Dep. 32:1–32:17); Doc. 49-30 (Ex. 29). Principal Skretta explained that "the stakes [were] too high" for him as building principal not to lead the special education program (SPED)

2

directly, himself.  Doc. 49-68 at 11 (Kincaid Dep. 32:1–32:17); Doc. 49-30 (Ex. 29).  Plaintiff

responded to Principal Skretta's email asking if she had done anything wrong because she had

worked with SPED for the last four years.  Doc. 49-68 at 12 (Kincaid Dep. 36:7–32:15); Doc.

49-30 (Ex. 29).  Principal Skretta replied that plaintiff had done "nothing wrong" but that "SPED

is very high stakes and as the head principal, I really need to be running it."  Doc. 49-30 (Ex. 29).

Principal Skretta testified that he took over supervision of SPED because the district was

under fire from the state for disproportionately imposing discipline on students with special

needs.  Doc. 49-22 at 41–42 (Skretta Dep. 192:5–193:20).  Specifically, Principal Skretta

testified that his supervisors, Dr. Viveros and Dr. Tucker-Nevels, had encouraged him to take

over special education because USD 500 was on probation with the state for "over-suspension of

special education kids in relation to other populations."  Doc. 49-22 at 8–10 (Skretta Dep. 56:11–

58:20).

### *March 2019 sexual assault and plaintiff's report of the incident*

A couple of weeks later, on Thursday, March 21, 2019, a female student reported a

sexual assault to plaintiff.  Doc. 49-68 at 15 (Kincaid Dep. 38:18–39:13); Doc. 49-32 (Ex. 31).

This student reported that student D.S., a special education student, had sexually assaulted her

two days earlier on March 19, 2019.  *Id.*  Plaintiff immediately contacted defendant's director of

Student Services about the reported sexual assault, and the Student Services director told plaintiff

to "write him up for sexual assault," which plaintiff did.[1]  Doc. 49-68 at 15, 16 (Kincaid Dep.

39:2–8, 40:12–16); Doc. 49-32 (Ex. 31).

Later the same day, at 3:58pm, plaintiff emailed Principal Skretta about the incident:

"[student D.S.] pushed a female student up against a wall and grinded up against her with his

---

[1]      Plaintiff testified that she contacted Student Services because the incident involved a special
education student.  Doc. 49-68 at 17 (Kincaid Dep. 41:1–4).

private parts."  Doc. 49-68 at 13–15 (Kincaid Dep. 37:18–39:13); Doc. 49-32 (Ex. 31).

Principal Skretta responded to this email about 10 minutes later asking plaintiff if there was

video or corroboration from witnesses of the sexual assault.  *Id.* at 18 (Kincaid Dep. 42:3–11).

Plaintiff responded that there was "some video, but not the entire act.  Lisa [Student Services

director] said it didn't matter and that we have to go with the victim's statement."  *Id.*  Plaintiff

testified that she contacted Student Services before contacting Principal Skretta because he was

out of the building and she believed she was following protocol.  *Id.* at 17 (Kincaid Dep. 41:5–

13).

      The next day, Friday, March 22, 2019, plaintiff entered the sexual assault incident

involving the students in Infinite Campus, a student information system used by the school

district.  Doc. 49-68 at 42 (Kincaid Dep. 81:3–20).  At that time, she also entered information

about a February 4, 2019, incident involving student D.S. into the Infinite Campus system.  Doc.

61-1 at 14, 15 (Kincaid Dep. 83:9–84:10, 85:21–86:25).[2]  Also on March 22, plaintiff emailed

district staff to schedule a sexual assault hearing for D.S., and also reported that his 10-day

suspension would start Monday and run through April 5th.  Doc. 49-35 at 2 (Ex. 35).  She did

not copy Principal Skretta on her initial email.  *Id.*  But later, plaintiff copied Principal Skretta on

the email communications about holding the disciplinary hearing the following Monday (March

25) after the hearing was scheduled.  *Id.* at 1.

      On March 26, plaintiff emailed Student Services directors to schedule a suspension

hearing, and she did not include Principal Skretta on the email.  Doc. 49-37 (Ex. 37).  A Student

Services director added Principal Skretta to the email chain two days later on March 28.  *Id.*  On

---

[2]      Plaintiff testified that she transferred information about a February 4, 2019, incident involving
student D.S. from her notes in "SILK," a different database, to the Infinite Campus system.  Doc. 61-1 at
14, 15 (Kincaid Dep. 83:9–84:10, 85:21–86:25).

March 26, Principal Skretta emailed plaintiff and other district representatives.  His message reduced student D.S.'s suspension from 10 to five days and stated that a "manifestation determination meeting" wasn't necessary.[3]  Doc. 49-38 (Ex. 38).  Student Services responded to this email advising that the school can't "impose a [disciplinary] Hearing without [first making] a Manifestation [determination]."  Doc. 49-39 (Ex. 39).  It also suggested a phone call to discuss the matter further.  *Id.*  A few minutes later, Principal Skretta emailed plaintiff and other district representatives a "retraction" of his earlier statement, changing D.S.'s suspension back to 10 days and confirming a manifestation determination hearing and due process hearing.  Doc. 49-38 (Ex. 38).  Principal Skretta told plaintiff that he planned to attend the manifestation determination hearing as the school representative and that she should not attend.  Doc. 49-68 at 28 (Kincaid Dep. 61:16–22).  Plaintiff testified that she believed Principal Skretta excluded her from the hearing to retaliate against her for reporting the assault.  *Id.* at 149 (Kincaid Dep. 286:10–19).  She also testified, however, that she wasn't entitled to attend the hearing.  *Id.* at 155 (Kincaid Dep. 310:1–10).  Principal Skretta testified that plaintiff did not need to attend the hearing because she wasn't in charge of SPED anymore.  Doc. 49-22 at 19 (Skretta Dep. 83:14–23).

### *February 4, 2019 incident with student D.S.*

About a month earlier that year, on February 4, 2019, a couple of girls reported that student D.S. hugged and touched them in the hallway and brushed his hands on their bottoms and made them uncomfortable.  Doc. 49-68 at 57 (Kincaid Dep. 106:6–11).  Plaintiff did not believe that D.S.'s conduct in February warranted discipline at the time, or that it warranted a report to

---

[3]    A manifestation determination hearing is held for incidents involving special education students to determine if behavior was a manifestation of the student's disability.  Doc. 49-68 at 30–31 (Kincaid Dep. 63:17–64:8).  If the hearing determines that the student's behavior was manifestation of a disability, then the school doesn't convene a suspension hearing and it doesn't impose discipline.  *Id.*

Student Services.  Also, plaintiff talked to D.S.'s grandmother about the incident and thought that such a conversation would suffice as a consequence.  Doc. 49-68 at 57–58 (Kincaid Dep. 106:14–22, 107:2–7).  Later, however, and in light of what happened on March 19, 2019, plaintiff entered the February 4, 2019 incident into the Infinite Campus system as a sexual assault.  Doc. 49-68 at 50–52 (Kincaid Dep. 92:4–95:24).

### Principal Skretta's March 29, 2019 formal letter of concern

On March 29, 2019, Principal Skretta met with plaintiff and gave her a "formal letter of concern" about how she had handled her reporting of the February and March incidents involving student D.S..  Doc. 49-68 at 40–41 (Kincaid Dep. 78:7–79:2); *see also* Doc. 49-44 (Mar. 29, 2019 Letter, Ex. 44).  Principal Skretta placed the formal letter of concern in plaintiff's personnel file.  Doc. 49-27 at 6–7 (Faircloth Dep. 21:9–22:3).  Principal Skretta consulted his supervisor, Dr. Tucker-Nevels, and the school district's human resources office before issuing the letter of concern to plaintiff.  Doc. 49-22 at 14–16 (Skretta Dep. 74:10–76:22).  Principal Skretta testified that he issued plaintiff this formal letter of concern to address her entry of discipline records in Infinite Campus and inform her of his expectations as her supervisor.  *Id.* at 16, 39 (Skretta Dep. 76:16–22, 189:20–23).

The letter of concern addressed plaintiff's late entry of the February 4, 2019 incident with D.S. on the student's disciplinary record in Infinite Campus.  Doc. 49-68 at 44, 48 (Kincaid Dep. 83:2–5, 88:9–22); Doc. 49-44 (Ex. 44).  Principal Skretta informed plaintiff that "more intensive and sustained consequential behavior support" was necessary for a student with "significant special needs[.]"  Doc. 49-44 at 1 (Ex. 44).  Plaintiff testified that she understood Principal Skretta's concern that she should have logged the February 4, 2019 incident in Infinite Campus so administrators "would be aware of it and that steps could be taken to address the student's

behaviors[.]"  Doc. 49-68 at 59 (Kincaid Dep. 109:2–14).  Principal Skretta testified that when

he learned there was no record of the February incident, he believed it was "unethical" that

plaintiff had failed to report it sooner.  Doc. 49-22 at 11 (Skretta Dep. 64:3–22).  He also testified

that the late entry was unethical because the student's behavior was severe enough that plaintiff

should have reported it.  *Id.* at 12 (Skretta Dep. 65:2–18).

Principal Skretta's letter of concern to plaintiff also addressed his concern that plaintiff

reported the March 19, 2019 incident involving student D.S. to Student Services before notifying

him.  Doc. 49-22 at 40 (Skretta Dep. 191:4–21); Doc. 49-68 at 59–60 (Kincaid Dep. 109:15–

110:9).  Principal Skretta testified that he did not have a problem with plaintiff consulting with

Student Services, but he was concerned that she did not talk to him about the incident first.  Doc.

49-22 at 40 (Skretta Dep. 191:4–21).  Principal Skretta testified that he issued the letter to clarify

his expectations as a supervisor and inform plaintiff of her duty to report any incident about

special education services at the school directly to him.  *See* Doc. 49-22 at 39 (Skretta Dep.

189:20–23).  Principal Skretta did not issue any other formal letters of concern or formally

discipline plaintiff in any other way during his tenure at Central Middle School.  Doc. 49-22 at

40–41 (Skretta Dep. 191:22–25, 192:1–4*).*

### *Plaintiff's response to formal letter of concern*

On March 31, 2019, plaintiff emailed two of defendant's HR representatives and

Principal Skretta's supervisor, Dr. Tucker-Nevels, about Principal Skretta's "formal write up" of

her (the March 29 formal letter of concern).  Doc. 49-45 at 3 (Ex. 45).  Plaintiff complained that

the write up was unfair and she had felt "single[d] out and harassed" by Principal Skretta for the

"last couple of months[.]"  *Id.*  Plaintiff stated that she would prefer not to have any discussions

with Principal Skretta alone and that she would like to discuss other instances where she felt bullied by Principal Skretta with one of defendant's HR representatives soon.  *Id.* at 4.

The next day, April 1, 2019, plaintiff met with Dr. Tucker-Nevels and Principal Skretta to discuss the letter of concern.  Doc. 61-1 at 21 (Kincaid Dep. 119:22–120:22).  During this meeting plaintiff explained that she did not believe that Principal Skretta could discipline her without citing a policy or procedure violation.  *Id.*  And, plaintiff testified, Principal Skretta responded in a "very upset, very angry, and very curt" manner.  *Id.*  As a result of the meeting, Principal Skretta and Dr. Tucker-Nevels decided that "the letter stood."  Doc. 49-68 at 67 (Kincaid Dep. 123:15–18).

### *Alleged harassment following plaintiff's report of sexual assault*

Plaintiff testified that following her report of student D.S. and her subsequent letter of concern, Principal Skretta started not to include plaintiff in some meetings, refused to acknowledge her presence at times, and rolled his eyes when she made suggestions.  *See* Doc. 49-68 at 74, 90 (Kincaid Dep. 139:3–17, 179:1–20).  Mary Votypka, a student counselor at Central Middle School, testified that when plaintiff suggested something in a meeting, Principal Skretta "would shoot [her suggestion] down" and when plaintiff "advocated for staff and students in meetings, [Principal Skretta] came back on her."  Doc. 61-6 at 3–4 (Votypka Dep. 24:12–25:25, 27:19–25).  Ms. Votypka testified that she witnessed Principal Skretta "talking down" to plaintiff about 20 or 25 times.  *Id.*

Other employees at Central Middle School had similar complaints about Principal Skretta's behavior.  Plaintiff testified that Assistant Principal Estes had problems with him "not including her in meetings and things that he had [been doing to plaintiff]."  Doc. 49-68 at 66 (Kincaid Dep. 122:16–23).  Plaintiff also testified that the school social worker had issues with

Principal Skretta "not fairly evaluating her and constantly making her change rooms and promising her things and then taking them away."  *Id.* at 67 (Kincaid Dep. 123:1–6).

Principal Skretta didn't complete plaintiff's performance evaluation that year.  Doc. 61-1 at 43 (Kincaid Dep. 307:13–308:23).  Principal Skretta didn't observe plaintiff in the classroom due to COVID-19.  Doc. 49-68 at 106 (Kincaid Dep. 204:7–15).  Principal Skretta didn't complete an evaluation for either plaintiff or the other assistant principal, Ms. Estes.  *Id.* at 107 (Kincaid Dep. 206:12–19).  Principal Skretta gave some of plaintiff's duties to the other assistant principal, Ms. Estes.  Doc. 61-8 at 5 (Estes Dep. 31:11–17).  And Ms. Estes testified Principal Skretta delegated some of plaintiff's duties to her "[b]ecause he did not want to talk to" plaintiff. *Id.*

Plaintiff testified that Principal Skretta adopted and applied more stringent attendance requirements to her as compared to other employees.  Doc. 61-1 at 35–36 (Kincaid Dep. 208:7–24, 209:11–211:12).  Principal Skretta spoke with plaintiff about arriving late to work.  Doc. 49-68 at 110–111 (Kincaid Dep. 209:5–211:21).  But he never formally disciplined or wrote up plaintiff about her attendance.  *Id.*  Plaintiff also testified that she has had other supervisors talk to her about absences and arriving late for work.  Doc. 49-68 at 111–12 (Kincaid Dep. 211:22–212:9).

Following the letter of concern, plaintiff claims that Principal Skretta sent emails "nitpicking . . . every single decision [she] made[.]"  Doc. 61-1 at 43 (Kincaid Dep. 306:6–15).  To support this assertion, plaintiff highlights the following three emails from February 2020. *First*, on February 9, 2020, Principal Skretta emailed plaintiff after he learned about a fire alarm at the school, and she hadn't notified him of it.  Doc. 49-49; *see also* Doc. 61-1 at 31 (Kincaid Dep. 184:11–185:21).  He requested that plaintiff inform him, in the future, of a fire alarm if he

was off campus when it occurred.  *Id.  Second*, on February 24, 2020, Principal Skretta emailed plaintiff and the other assistant principal about plaintiff calling 911 and not informing him that she had done so.  Doc. 49-50 (Ex. 50); *see also* Doc. 61-1 at 31–32 (Kincaid Dep. 187:23– 190:8).  Principal Skretta requested that both assistant principals, in the future, notify him as soon as possible if someone at the school called 911.  *Id.  Third*, on February 25, 2020, Principal Skretta emailed his supervisors requesting that they remove plaintiff from her position at his school.  Doc. 61-4 at 25 (Skretta Dep. 129:18–130:1).  Defendant denied Principal Skretta's request, and plaintiff remained in her role as assistant principal at Central Middle School.  Doc. 49-29 at 4 (Votypka Dep. 26:7–13).

### *November 2020 Title IX report*

In July 2020, plaintiff met with Lisa Walker, the school district's Title IX coordinator, and Elizabeth Faircloth, the school district's investigator, to discuss her concerns with Principal Skretta.  Doc. 61-3 at 1 (Faircloth Dep. 14:8–15:20).  Plaintiff called the meeting primarily to discuss the March 29, 2019 formal letter of concern.  *Id.*

On November 9, 2020, plaintiff again met with the Title IX director and a representative from human resources.  Doc. 61-3 at 18 (Faircloth Dep. 91:20–92:21); Doc. 49-68 at 118 (Kincaid Dep. 235:11–24).  This time, she completed a formal complaint.  *Id.*  After plaintiff submitted the formal complaint to the school district, Ms. Faircloth contacted plaintiff and listened to her concerns.  *Id.* (Kincaid Dep. 235:11–17).  Ms. Faircloth then conducted a Title IX investigation.  *Id.*  As a result of this investigation, the school district placed Principal Skretta on leave.  Doc. 49-68 at 124 (Kincaid Dep 243:3–11).  Principal Skretta never returned to the building or supervised plaintiff again; in fact, plaintiff never saw Principal Skretta again after filing the complaint.  *Id.*  Additionally, as a result of the Title IX investigation, the school district

amended the March 29, 2019 letter of concern to a "letter of reprimand for policy violations."
Doc. 61-3 at 16–17 (Faircloth Dep. 84:22–85:19).  Ms. Faircloth testified that she and her
supervisors "felt very strongly that [plaintiff] had not handled the situation appropriately" and
"that some sort of discipline was warranted."  *Id.*  (Faircloth Dep. 86:9–87:5).

### November 2020 Title VII charge of discrimination with EEOC

On November 12, 2020, plaintiff filed a charge of discrimination with the EEOC.  Doc.
49-67 (Ex. 80).  On November 22, 2020, defendant received notice of a charge of employment
discrimination from the EEOC.  Doc. 49-55 at 1 (Ex. 55).  The notice explained that the
circumstances of alleged discrimination involved retaliation and sex discrimination under Title
VII.  *Id.*  It also explained that the allegations involved events that allegedly occurred on or about
February 9, 2020 through October 22, 2020 and may continue after that date.  *Id.*  On January 26,
2021, the EEOC issued plaintiff a notice of right to sue.  Doc. 27 at 6.

In addition to alleging retaliation against Principal Skretta, plaintiff alleges that defendant
failed to hire her for any of its elementary school principal positions as retaliation for reporting
the student sexual assault.  The court now turns to the facts relevant to this theory of retaliation,
those involving defendant's hiring process.

### Elementary school principal hiring process

In Spring 2019, plaintiff applied for five vacant elementary principal positions.  Doc. 49-
59 at 4 (Ex. 59).  For the 2019 assistant principal and principal interview process, defendant used
a "Martin Haberman" interview process.  Doc. 49-28 at 2–3 (Scott Dep. 6:11–7:10).  This
interview process involved electronic pre-screening questions followed by interviews with
administrators who were certified to conduct Haberman interviews.  *Id.* at 3, 4 (Scott Dep. 7:2–
15, 8:6–20).  In addition to the pre-screening questions, candidates prepared a plan or project for

the interview.  Doc. 49-5 at 2 (Miguel Decl. ¶ 8).  For the in-person segment of the interview process, a certified administrator asked candidates Haberman interview questions, then scored candidates based on their answers.  Doc. 49-28 at 2 (Scott Dep. 6:11–23).  "Instructional Improvement Officers" over the schools that were hiring principals typically conducted the interviews.  Doc. 49-5 at 1 (Miguel Decl. ¶ 6).  The interviewers then combined the scores from the Haberman interviews and the projects and submitted the top candidates to the superintendent for a final decision.  Doc. 49-5 at 2 (Miguel Decl. ¶ 10); Doc. 49-28 at 4–5 (Scott Dep. 8:23–9:12).  Defendant testified that it did not review performance evaluations of an "in-house candidate" as a part of the hiring process.  Doc. 49-28 at 5 (Scott Dep. 9:13–9:17).

Dr. Alicia Miguel and Dr. Kimberly Shaw, Instructional Improvement Officers for the school district, conducted the administrator interviews in the Spring of 2019.  Doc. 49-5 at 1 (Miguel Decl. ¶¶ 2–3); Doc. 49-60 at 1 (Shaw Decl. ¶¶ 3–4).  Dr. Miguel and Dr. Shaw prepared the scores from the interviews for the Spring 2019 elementary principal positions and submitted them to the superintendent for a final decision.  Doc. 49-5 at 2 (Miguel Decl. ¶ 10); Doc. 49-60 at 1 (Shaw Decl. ¶ 5).  When conducting the Spring 2019 interviews for principal positions, Dr. Miguel didn't know about the letter of concern issued by Principal Skretta to plaintiff.  Doc. 49-5 at 3 (Miguel Decl. ¶ 25).  Dr. Miguel also was not aware of any issue involving plaintiff and student D.S. at Central Middle School.  *Id.* (Miguel Decl. ¶ 26).  Dr. Miguel did not review plaintiff's personnel file as part of the interview process, nor did she talk to Principal Skretta about plaintiff's performance or her principal application.  Doc. 49-5 at 3 (Miguel Decl. ¶¶ 27–28).  Likewise, Dr. Shaw didn't know about the letter of concern Principal Skretta had issued plaintiff or of any issue involving plaintiff and student D.S. at Central Middle school during her evaluation of plaintiff's principal applications.  Doc. 49-60 at 2 (Shaw Decl. ¶¶ 14–15).  Dr.

Shaw did not review plaintiff's personnel file as a part of the interview process or talk to Principal Skretta about plaintiff's performance or principal applications. *Id.* (Shaw Decl. ¶¶ 16–17).

That spring, about 64 applicants (including plaintiff) applied for the five open positions. Doc. 49-5 at 1 (Miguel Decl. ¶ 5). Plaintiff applied for the elementary principal positions on March 18, 2019. Doc. 50-2 (Ex. 60). Plaintiff made it past the preliminary written round, then Dr. Shaw and Dr. Miguel conducted plaintiff's next two rounds of interviews (which plaintiff referred to as second and third rounds of the process, viewing the written round as the first round). Doc. 61-1 at 40–41 (Kincaid Dep. 267:9–268:11, 270:25–271:20). Plaintiff did not make it past the third round of the interview process. Doc. 61-1 at 41 (Kincaid Dep. 271:4–20). Superintendent Dr. Charles Foust received a list of candidates and then made a recommendation to the Board of Education for five individuals at the five schools. Doc. 49-28 at 6 (Scott Dep. 12:1–8); Doc. 49-65 at 1 (Foust Decl. ¶¶ 4–5). His recommendations did not include plaintiff. *Id.* The court now describes the qualifications of the five individuals who defendant hired instead of plaintiff.

### *Individuals hired instead of plaintiff for elementary school principal positions*

Defendant selected Victor Aguilar for the principal's position at Silver City Elementary in the Spring of 2019. Doc. 49-5 at 2 (Miguel Decl. ¶ 11). The school district had employed Mr. Aguilar since 2010. Mr. Aguilar had years of experience as a middle school assistant principal and athletic director in the district. *Id.* (Miguel Decl. ¶ 12). Mr. Aguilar is Hispanic and a native Spanish speaker. Defendant testified that it considered these characteristics important in its hiring decision because Silver City Elementary had a high percentage of Hispanic students and Spanish-speaking families. Doc. 49-60 at 1 (Shaw Decl. ¶ 6).

Defendant selected Dr. Cesar Alvarez for the principal's position at Francis Willard Elementary School. Doc. 49-60 at 2 (Shaw Decl. ¶ 8). Dr. Alvarez had worked as an assistant principal at an elementary school in Texas since 2016. Doc. 49-60 at 2 (Shaw Decl. ¶ 7). Dr. Alvarez is Spanish speaking and bilingual. Defendant testified that because Dr. Alvarez is bilingual, he could "serve as a positive role model for the Spanish speaking students at Francis Willard Elementary School." Doc. 49-5 at 2 (Miguel Decl. ¶ 16).

Defendant selected Dr. Brooke Brutto for the principal's position at Lindbergh Elementary School. Doc. 49-60 at 2 (Shaw Decl. ¶ 9). In Spring 2019, Dr. Brutto had success in her position as an instructional coach at Lindbergh Elementary School. Doc. 49-5 at 2–3 (Miguel Decl. ¶¶ 18–20); Doc. 49-60 at 2 (Shaw Decl. ¶ 10). She also had experience working as an elementary principal and middle school assistant principal in another school district. *Id.*

Defendant selected Karl Unger for the principal's position at Banneker Elementary School. Doc. 49-5 at 3 (Miguel Decl. ¶ 21). Defendant testified that Mr. Unger had elementary school experience that plaintiff did not have. *Id.* (Miguel Decl. ¶ 22).

Defendant selected Dr. Heather Calvert for the principal's position at Grant Elementary School. Doc. 49-60 at 2 (Shaw Decl. ¶ 11). When she interviewed, Dr. Calvert worked as an elementary school principal at a school in Topeka, Kansas, and had held that position since 2016. *Id.* (Shaw Decl. ¶ 12). Defendant testified that Grant Elementary School needed a "principal with a strong instructional foundation at the elementary level" like Dr. Calvert to help improve test scores at the school. *Id.* (Shaw Decl. ¶ 13).

## II.    Legal Standard

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).  "Unsubstantiated allegations carry no probative weight in summary judgment proceedings."  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*,

956 F.2d 949, 951 n.3 (10th Cir. 1992)).  To survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

The federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.  To the contrary, it is an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

## III.   Analysis

Plaintiff asserts that defendant retaliated against her for reporting the sexual assault of a student in violation of Title VII and Title IX.  After this court's Order partially granting defendant's Motion to Dismiss (Doc. 27), three of plaintiff's claims remain:  a claim for retaliatory harassment under Title VII and claims for retaliation and retaliatory harassment under Title IX.  Doc. 43 at 10 (Pretrial Order ¶ 4.a.).

Defendant asserts that it is entitled to summary judgment against all of these claims.  It argues that the court should enter summary judgment because plaintiff has failed to adduce adequate evidence to support a submissible case for her claims.  The court finds defendant's arguments persuasive.  And so, for reasons explained below, court grants its summary judgment motion.

### A.  Title VII retaliatory harassment claim

Plaintiff claims that defendant violated Title VII by engaging in retaliatory harassment. The alleged harassment consists of two types of conduct.  First, she alleges defendant is liable for Title VII retaliatory harassment because "defendant's supervisory employee" harassed her in retaliation for reporting the sexual assault of a female student.  Doc. 43 at 10 (Pretrial Order at ¶

4.a.1.).  Second, she asserts defendant violated Title VII by failing to stop Principal Skretta's harassment of plaintiff in retaliation for reporting the sexual assault.  *Id.*

Plaintiff's retaliatory harassment claim is evaluated under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4]  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).  First, a plaintiff must provide a prima facie case of discrimination.  *See id.* at 1192.  Second, if plaintiff meets the prima facie burden, then the burden shifts to defendant to produce a legitimate, non-retaliatory reason for its employment action.  *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003).  Last, if defendant satisfies that burden, the burden then shifts back to plaintiff to show that defendant's proffered reason for the employment action is pretextual.  *Id.*

### 1.  Prima facie case

To establish a prima facie case of retaliatory harassment under Title VII, "a plaintiff must demonstrate (1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006)).

As a threshold matter, the court assesses the scope of plaintiff's alleged protected activity and plaintiff's Motion to Modify the Pretrial Order (Doc. 59) as well as the subsequent briefing

---

[4]      A plaintiff also can prove Title VII retaliatory harassment with direct evidence of discrimination. *Khalik*, 671 F.3d at 1192.  To the extent that plaintiff makes the same "direct evidence" argument under Title VII that she makes for her Title IX claim, *see* Doc. 61 at 108 and 126, the court concludes that plaintiff hasn't come forward with direct evidence of discrimination under Title VII for the same reasons she hasn't adduced such evidence under Title IX.  *See infra* Part III. Section C..  Thus, the court analyzes plaintiff's Title VII retaliatory harassment claim under the *McDonnell Douglas* burden shifting framework because she has adduced circumstantial evidence only.

of the issue by both parties (Doc. 60, Doc. 69, Doc. 73).  Specifically, on March 11, 2022,

United States Magistrate Judge Teresa James entered the Pretrial Order (Doc. 43).  It supersedes

all pleadings and controls the subsequent course of this case.  *See* Fed. R. Civ. P. 16(d); D. Kan.

Rule 16.2(b).  Under Fed. R. Civ. P. 16(d) and D. Kan. Rule 16.2(b), the court won't modify the

Pretrial Order except by consent of the parties and with the court's approval, or by an order of

the court necessary to prevent manifest injustice.

Specifically, plaintiff asks the court to modify the Pretrial Order to include additional

specific allegations of protected activity in the summary of her Title VII claim.  Doc. 60 at 2.  In

the Pretrial Order, plaintiff asserts the following theory of recovery under Title VII:

1.  Title VII retaliatory harassment *(Count III of Complaint)*, specifically, Defendant
    engaged in harassment and failed to stop Skretta's harassment of Plaintiff in
    retaliation for reporting the sexual assault of a female student; Defendant's
    supervisory employee engaged in harassment of Plaintiff in retaliation for reporting
    the sexual assault of female student.

Doc. 43 at 10 (Pretrial Order ¶ 4.a.1.).

As things stand currently, the only protected activity plaintiff alleges under her Title VII

theory of recovery is reporting the sexual assault of a female student.  Plaintiff asks the court to

modify the Pretrial Order, enlarging it to add the following three allegations of protected activity

to the summary of her Title VII legal claim:

- On or about March 31, 2019 Plaintiff reported Skretta's conduct to USD 500's
  Human Resources department and to Skretta's superior, submitting a written
  report that stated that she felt singled out and harassed by Skretta, specifically
  when he gave her a formal write-up without referencing any policy or
  procedure violation.

- Plaintiff reported this conduct on multiple occasions to USD 500
  administrators, but USD 500 did nothing to stop the conduct.

- Plaintiff sought to appeal the investigator's conclusion that Skretta had not
  retaliated against Plaintiff, even though numerous employees verified

Skretta's retaliatory harassment of Plaintiff, but USD 500 took no action on it.[5]

Doc. 60 at 2.

Plaintiff asserts that the court should amend the Pretrial Order to clarify that "all of the protected activity under Title VII described in [plaintiff's factual contentions section of the Pretrial Order] is incorporated by reference in the Title VII theory of the case." Doc. 60 at 1. However, plaintiff also concedes that not including these allegations was an "oversight." *Id.* at 2. Defendant responds to plaintiff's request to amend the Pretrial Order, arguing that plaintiff's proposed amendments are untimely, futile, and prejudicial. Doc. 69 at 8.

The Pretrial Order controls the course of litigation. D. Kan. Rule 16.2(b). "As such, claims, issues, defenses, or theories of damages not included in the pretrial order are waived." *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002). Under Fed. R. Civ. P. 16(e), the court may modify a final pretrial order only "to prevent manifest injustice." The party moving for modification bears the burden of demonstrating manifest injustice. *See Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1222 (10th Cir. 2000). The Tenth Circuit considers the following four factors to determine whether a party can demonstrate manifest injustice: "(1) prejudice of surprise to the party opposing trial of the issue; (2) the ability of that party to cure any prejudice; (3) disruption to the orderly and efficient trial of the case by inclusion of the new issue; and (4) bad faith by the party seeking to modify the order."[6] *Id.* Another factor the court should

---

[5]     Plaintiff first listed the three actions shown in these three bullet points as ones she sought to add to the Pretrial Order. Doc. 60 at 2. But later, in the same filing, she listed six actions of alleged protected activity. Doc. 60 at 4. Plaintiff's most recent briefing on the matter refers to "*three* allegations" as the "contentions of additional protected activity" relevant to the motion (those listed here). Doc. 73 at 2 (emphasis added). The court therefore construes plaintiff's motion to amend to encompass just the list of three actions shown on page 2 of Doc. 60 (and not six, as referenced on page 4 of the same filing).

[6]     The Tenth Circuit clarifies that it "has never imposed such a requirement upon a district court when deciding whether to amend a pretrial order or allow evidence or issues outside the pretrial order to

consider is "whether the party favoring amendment of the pretrial order formally and timely moved for such modification in the trial court." *Id.* at 1223.

Plaintiff argues that manifest injustice will occur if the court does not allow her to amend the Pretrial Order, and that the *Koch* factors weigh in favor of granting an amendment. The court addresses each of those factors, now.

*First*, plaintiff asserts that amending the Pretrial Order will not prejudice or surprise defendant because the "Title VII protected activity is clearly stated in [p]laintiff's contentions" so defendant "has been fully apprised of those facts." Doc. 60 at 3. Plaintiff asserts that she is asking the court simply to copy and paste three bullet points from her factual contentions to include them in her Title VII legal claim. Doc. 73 at 2. In response, defendant argues that plaintiff, in the Pretrial Order, identified the basis of her Title VII retaliatory harassment claim as "retaliation for reporting the sexual assault of a female student," Doc. 43 at 10 (Pretrial Order ¶ 4.a.1.), and plaintiff consistently has relied on this theory as the basis for her Title VII claim. Defendant also argues that it "prepared and filed summary judgment based on [p]laintiff's claim as presented" in the Pretrial Order, so it would sustain prejudice by plaintiff adding new protected activities as support for her Title VII claim. Doc. 69 at 7. The court agrees. Allowing plaintiff's modification now—after defendant has filed its summary judgment motion—would prejudice defendant. Thus, this first factor favors denying plaintiff's motion to modify.

*Second*, plaintiff argues that defendant can cure any prejudice that amendment might impose because defendant argued in its motion for summary judgment that plaintiff abandoned

---

be presented; rather, [the Circuit has] always discussed these factors as matters which [the Circuit] should consider to determine if the district court's decision constitutes an abuse of discretion." *Koch*, 203 F.3d at 1222 n.10. Nonetheless, our court has applied the Circuit's four-factor test to determine whether to amend a pretrial order. *See D-J Eng'g, Inc. v. 818 Aviation, Inc.*, No. 14-1033-JWB, 2018 WL 2926387, at *2 (D. Kan. June, 11 2018).

or waived these bases for her Title VII claim.  So, plaintiff argues, defendant "recognized the oversight" and could have addressed the claims not included in the Pretrial Order in its motion for summary judgment.  Doc. 60 at 5.  This logic is unconvincing.  Arguing that defendant could have addressed claims plaintiff hadn't included in the Pretrial Order doesn't provide an opportunity to cure prejudice.  This second factor favors denying the motion to modify.

*Third*, plaintiff argues that amending the Pretrial Order will not disrupt an orderly and efficient trial because the proposed amendment does not add any new claims or facts.  *Id.*  The court agrees that the amendment does not add any new facts because the proposed amendment includes facts already asserted in support of plaintiff's Title IX claims.  But, the proposed amendment would insert a different theory of recovery for plaintiff's Title VII claim.  This third factor is, at best, neutral.  The additional claim, if permitted, might not disrupt an orderly trial, but it would disrupt the orderly pretrial process.

*Fourth*, plaintiff asserts that she did not act in bad faith, and an "oversight" on her part led to her failure to include all of the protected activity in her legal claim for Title VII retaliatory harassment.  Doc. 60 at 5.  Defendant disagrees.  It alleges "lack of good faith" on plaintiff's part because plaintiff "attempts to now included bases which she admitted in discovery to not be a basis of her claim."  Doc. 69 at 7.  On parties' competing allegations of bad faith (or lack of it), the court can't discern whether this fourth factor favors modifying the Pretrial Order.  Thus, this fourth factor is a neutral one.

The court notes that it entered the Pretrial Order on March 11, 2022.  Plaintiff did not file her motion to modify the Pretrial Order (Doc. 59) until May 6, 2022—a month or so after defendant had filed its summary judgment motion.  "Untimeliness or undue delay is sufficient cause for denying leave to amend without any showing of prejudice to the other party."  *Collins*

*v. Wal-Mart, Inc.*, 245 F.R.D. 503, 512 (D. Kan. 2007) (citing *Las Vegas Ice & Cold Storage Co. v. Far W. Bank*, 893 F.2d 1182, 1185 (10th Cir.1990)).  The court agrees with defendant.  The timing of plaintiff's motion favors denying the request to modify the Pretrial Order.  "'A plaintiff cannot escape the binding effect of the pretrial order by raising new issues in a response to the defendant's motion for summary judgment.'"  *Sunderman v. Westar Energy, Inc.*, 520 F. Supp. 2d 1269, 1278 (D. Kan. 2007), *aff'd*, 307 F. App'x 224 (10th Cir. 2009) (quoting *Robleado v. Deffenbaugh Indus.*, 136 F. Supp. 2d 1179, 1189 (D. Kan. 2001)).  "Although the Tenth Circuit has recognized that a pretrial order 'should be liberally construed to cover any of the legal or factual theories that might be embraced by its language' it has also found, upon a 'careful reading of [that] court's cases reviewing trial courts' construction of pretrial orders,' that 'a district court may more strictly construe a pretrial order when that order has been refined over time, properly drawn, and drafted with substantial specificity.'"  *Id.* (quoting *Koch v. Koch Indus.*, 203 F.3d 1202, 1220–21 (10th Cir. 2000)).

In sum, the court finds the first and second of the *Koch* factors favor denying the motion to modify the Pretrial Order.  The other two factors are neutral.  And, the additional factor—timing of plaintiff's request to modify—disfavors modification as well.  On balance, the *Koch* factors favor denying plaintiff's request to amend the Pretrial Order.  The court thus denies plaintiff's request to amend (Doc. 59).  Having declined to amend the Pretrial Order, the court now returns to the Title VII prima facie case.  Specifically, the analysis begins with the first requirement of a prima facie case, *i.e.*, has plaintiff "engaged in protected opposition to discrimination[?]"  *Argo*, 452 F.3d at 1202.

###### a.   Protected opposition to discrimination

Defendant argues that plaintiff did not engage in activity protected by Title VII when she reported that one student had sexually assaulted another student.  And so, defendant argues, plaintiff can't predicate a viable Title VII retaliatory harassment claim on the report.  Plaintiff responds, arguing that her original March 21, 2019 report of the student-on-student sexual assault qualifies as protected activity under Title VII.  Plaintiff reasons that she had a good faith belief that she was opposing discrimination and a good faith belief that sexual harassment under Title IX had occurred.  This, she argues, qualifies as Title VII protected activity.  The defendant has the better of this argument.

Title VII makes it unlawful for an "employer to discriminate against any of his employees" because the employee has "opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  "Protected activity for the purposes of Title VII retaliation includes either (1) participating in or initiating a Title VII proceeding or (2) opposing discrimination made unlawful by Title VII."  *Boese v. Fort Hays State Univ.*, 814 F. Supp. 2d 1138, 1146 (D. Kan. 2011), *aff'd*, 462 F. App'x 797 (10th Cir. 2012).  Here, the Pretrial Order preserves just one of these two options, *i.e.*, that defendant retaliated against her for opposing discrimination rendered unlawful by Title VII.  *See* Doc. 43 at 10 (Pretrial Order ¶ 4.a.1.).[7]

"To show she engaged in protected activity, [plaintiff] doesn't need to show that she reported an actual Title VII violation; rather, she must only show 'a reasonable good-faith belief

---

[7]    Also, plaintiff never argues that reporting the sexual assault constituted participating in or initiating a Title VII proceeding.  *See* Doc. 61 at 120–21.  Instead, she only argues that she engaged in "protected activity under the opposition clause[.]"  *Id.* at 120.

that' she was opposing discrimination." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018) (quoting *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004)).  More specifically, plaintiff here claims that defendant—acting through its representative, Principal Skretta—engaged in retaliatory harassment after she reported one student had sexually assaulted another student.  But as a matter of law, plaintiff's theory can't qualify as actionable retaliation for "opposing discrimination made unlawful by Title VII." *Fassbender*, 890 F.3d at 890.  This is so because plaintiff didn't engage in activity protected by Title VII when she reported the student-on-student sexual assault.  Such a report doesn't qualify as "an unlawful employment practice" consisting of discrimination based on an individual's "race, color, religion, sex, or national origin."  *See* 42 U.S.C.A. § 2000e-2; *see also Battino v. Redi-Carpet Sales of Utah, LLC*, No. 20-4081, 2021 WL 4144974 at *5 (10th Cir. 2021) (affirming summary judgment against Title VII retaliation claim because plaintiff's alleged protected activities—*i.e.* becoming pregnant, informing her employer of her pregnancy, and asking for time off to have her baby—were not protected "opposition" to a practice that Title VII makes unlawful).

As our Circuit has explained, albeit in an unpublished case, making "a vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another protected category protected by Title VII) does not constitute protected activity and will not support a retaliation claim."  *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004).  *Anderson* illustrates this principle and its decisive consequences for the current case.

In *Anderson*, plaintiff consistently had received evaluations rating her performance as "satisfactory or better."  *Id.* at 914.  But things changed after she submitted a complaint against

her supervisor.  *Id.*  The plaintiff's complaint "characterized the nature of her grievance as 'Harassment/Discrimination.'"  *Id.* at 916.  But though this complaint asserted "a lengthy history of conduct by her supervisor[,]" *id.*, it never alleged a racial bias and never tried "to show that such bias was the motivation for the mistreatment that [plaintiff] experienced."  *Id.*  When the case reached trial, the district court granted defendant's motion for judgment as a matter of law.

The Tenth Circuit affirmed, concluding that plaintiff had "failed to present evidence of protected activity."  *Id.*  The Circuit reasoned that the claim might warrant a different outcome "[i]f [plaintiff] had included an allegation of mistreatment based on her race [because] this could amount to protected activity even if the allegation ultimately proved to be meritless."  *Id.*  *Anderson* also explained that even if plaintiff's supervisor "did retaliate against [plaintiff] for filling a complaint, the complaint was not protected activity under Title VII; [and] consequently the supervisor's retaliation was not unlawful under Title VII."  *Id.*

Four years later, the Tenth Circuit reinforced *Anderson*'s holding in a published case—*Hinds v. Sprint/United Management Co.*, 523 F.3d 1187 (10th Cir. 2008).  In it, plaintiff claimed that his employer had engaged in "ADEA retaliation" because plaintiff had complained about age discrimination in his workplace.  *Id.* at 1201.  The trial court—the District of Kansas—rejected plaintiff's ADEA retaliation claim.  The Tenth Circuit affirmed, organizing its analysis around five purported acts of protected activity.  Just two of them matter to the current discussion.

First, plaintiff claimed that one of defendant's employees had retaliated against him because plaintiff gave "negative evaluations [to] managers."  *Id.* at 1202–03 (discussing plaintiff's November 2003 email).  Second, plaintiff asserted defendant had retaliated because he "critiqued [defendant's] management paradigms and internal policies."  *Id.* at 1203 (discussing

January 2004 email). The Tenth Circuit rejected both arguments, concluding that neither could qualify as protected activity.

The Circuit reasoned that "[n]owhere in either email does [plaintiff] mention or even allude to age or age discrimination." *Id.* Judge Gorsuch's opinion explained that "no magic words are required," but "to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by ADEA. General complaints about company management and one's own negative performance evaluation will not suffice." *Id.* (footnote omitted); *see also Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("[A]n employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII.").

In the current case, summary judgment is appropriate because "it is not remotely clear from the evidence that plaintiff, in the course of reporting [the student-on-student sexual assault], conveyed to defendant a concern 'that the employer has engaged in a practice made unlawful' by Title VII." *Fassbender v. Correct Care Sols., LLC*, No. 15-CV-9373-JWL, 2017 WL 529602, at *10 (D. Kan. Feb. 9, 2017) (quoting *Hinds*, 523 F.3d at 1203), *aff'd in part, rev'd in part and remanded*, 890 F.3d 875, 891 (10th Cir. 2018) (affirming district court's holding that employee did not engage in protected activity supporting Title VII retaliation claim). Plaintiff did not convey to her employer—the school district—or Principal Skretta her concern that her employer had engaged in a practice made unlawful by Title VII. She reported a student's sexual assault of another student. *See Hinds*, 523 F.3d at 1203 ("Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful" by Title VII.); *see also Tracy v. Vail Resorts, Inc.*, No. 21-4145, 2022 WL 16557393, at *4 (10th Cir. Nov. 1, 2022) (affirming

dismissal of Title VII claim where district court held plaintiff's reports to management of hazardous working conditions were not protected activity under Title VII); *Cardwell v. Davis Polk & Wardwell LLP*, No. 1:19-CV-10256-GHW, 2021 WL 4434935, at *30 (S.D.N.Y. Sept. 23, 2021) (holding that an "ambiguous complaint . . . does not qualify as protected activity because it was not sufficiently pointed to put any Defendant on notice that [plaintiff] was complaining about discrimination under federal, state, or city law.").

Also, summary judgment is appropriate because "plaintiff cannot show that she had a reasonable, good faith belief that she was opposing discrimination prohibited by Title VII." *Fassbender*, No. 15-CV-9373-JWL, 2017 WL 529602, at *10 (citing *Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003)).  Plaintiff argues that she acted on a reasonable, good faith belief that she opposed discrimination when she reported a student's sexual assault of another student.  Again, to establish Title VII protected activity, plaintiff "must only show 'a reasonable good-faith belief that' she was opposing discrimination[,]" she "doesn't need to show that she reported an actual Title VII violation[.]"  *Fassbender*, 890 F.3d at 890 (quoting *Hertz*, 370 F.3d at 1015–16).  Plaintiff argues that when she reported the student sexual assault, she asserted a violation of Title IX, thus, she had a reasonable, good faith belief that she was opposing discrimination.  *See* Doc. 61 at 120–21.  But Title VII demands more evidence than plaintiff has adduced.  To establish a triable issue on protected opposition under Title VII, plaintiff must establish she had a reasonable belief she had opposed an "unlawful employment practice" enumerated in Title VII.

"Title VII is a 'precise, complex, and exhaustive' statute, and it defines the term 'unlawful employment practice' with characteristic exactitude."  *Cooper v. N.Y. State Dep't of*

*Lab.*, 819 F.3d 678, 680–81 (2d Cir. 2016) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570

U.S. 338, 340 (2013)).

> [Title VII] enumerates specific unlawful employment practices. *See* § 2000e-
> 2(a)(1), (b), (c)(1), (d) (status-based discrimination by employers, employment
> agencies, labor organizations, and training programs, respectively); § 2000e-2(*l*)
> (status-based discrimination in employment-related testing); § 2000e-3(a)
> (retaliation for opposing, or making or supporting a complaint about, unlawful
> employment actions); § 2000e-3(b) (advertising a preference for applicants of a
> particular race, color, religion, sex, or national origin).

*Nassar*, 570 U.S. at 356.

"Thus, a [Title VII] plaintiff alleging unlawful retaliation may not recover unless [she]

reasonably believed that the conduct [she] opposed ran afoul of one of these particular statutory

proscriptions." *Cooper*, 819 F.3d at 680–81 (citing *Manoharan v. Columbia Univ. Coll. of

Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) (objecting to an employer's failure to

adhere to its own affirmative-action program is not protected activity, because such a failure is

not an "unlawful employment practice" under Title VII))).

Applying this legal principle, the court concludes that no reasonable jury could find that

plaintiff reasonably believed the conduct she opposed—here a better word is reported, *i.e.*, one

student's sexual assault of another student—was an unlawful employment practice under Title

VII. So, plaintiff cannot possibly carry her burden to show that she engaged in protected

opposition to discrimination under Title VII. The court thus grants summary judgment against

plaintiff's Title VII retaliatory harassment claim.

Case law from other Circuits supports this conclusion. In a recent opinion, the Second

Circuit found that plaintiff, a Delta flight attendant, couldn't "demonstrate that a reasonable

similarly situated person would have a good-faith, reasonable belief that Delta was engaged in an

unlawful employment practice" when she reported a *passenger's* racist remark to her

pilot. *Leroy v. Delta Air Lines*, No. 21-267-CV, 2022 WL 12144507, at *5 (2d Cir. Oct. 27,

2022). The Second Circuit held "the passenger's comment was not an employment practice, so

it falls outside the scope of the NYCHRL [New York City Human Rights Law]." *Id.* (citing

*Cooper*, 819 F.3d at 681 ("[A Title VII] plaintiff alleging unlawful retaliation may not recover

unless he reasonably believed that the conduct he opposed ran afoul of one of [Title VII's]

particular statutory proscriptions.")).[8]

     In *Cooper*, the Second Circuit affirmed a district court holding that the conduct plaintiff

had opposed—"amendment of internal procedures in a manner that, she believed, would permit

political considerations to influence the evaluation of discrimination claims"—wasn't a

"'practice made an unlawful employment practice' by Title VII." *Cooper*, 819 F.3d at 681

(quoting 42 U.S.C. § 2000e-3(a)). The court concluded that plaintiff couldn't "reasonably have

believed otherwise" because Title VII "defin[es] with great care and precision those behaviors

that qualify as unlawful employment practices," and doesn't obligate employers "to maintain any

particular procedures for handling internal complaints." *Id.* (internal quotation marks omitted).

     In *Wimmer v. Suffolk County Police Department*, the Second Circuit addressed, for the

first time, the issue "whether a complaint of retaliation for opposing discrimination by co-

employees against non-employees [was] cognizable under Title VII[.]" 176 F.3d 125, 136 (2d

Cir. 1999). The Circuit affirmed a district court's holding that the plaintiff hadn't engaged in a

protected activity under Title VII. *Id.* There, plaintiff alleged that defendant issued him poor

evaluations and eventually terminated him for "report[ing] overhearing racial slurs made by

---

[8]    Though *Leroy* analyzed a New York anti-discrimination claim arising under the NYCHRL, the Second Circuit analyzed this state law claim as it would a Title VII retaliation claim. *See Leroy*, 2022 WL 12144507 at *3–5, n.4 ("the NYCHRL treats Title VII as 'a floor below which the NYCHRL cannot fall,' *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 410 (2d Cir. 2015) (alteration omitted) (quoting N.Y.C. Local L. No. 85, § 1), we assume here that it includes the liability we identified in *Summa*.").

police officers against black citizens and perhaps for questioning [another officer's] two stops of minority (Hispanic) motorists without cause." *Id.* at 135–36.

Drawing from case law in other Circuits, the Second Circuit held plaintiff's claim was not cognizable under Title VII "because his opposition was not directed at an unlawful *employment practice* of his employer." *Wimmer*, 176 F.3d at 134–35; *see also Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (holding plaintiff's report of his coworker's racially derogatory comment to his supervisors did not constitute opposition to an unlawful employment practice as a matter of law, and plaintiff didn't have an objectively reasonable belief that he was opposing an unlawful employment practice when he made the report); *Crowley v. Prince George's Cnty., Md.*, 890 F.2d 683, 687 (4th Cir. 1989) (holding plaintiff's alleged protected activity— "investigating instances of racial harassment perpetrated by police officers against members of the community"—wasn't cognizable under Title VII); *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978) ("[N]ot every act by an employee in opposition to racial discrimination is protected [by Title VII].  The opposition must be directed at an *unlawful employment practice* of an employer . . . ." (emphasis added)).

In the current case, plaintiff could not reasonably have believed that she had opposed an unlawful employment practice prohibited by Title VII when she reported that one student had sexually assaulted another.  Reporting student-on-student sexual harassment, like investigating police officers' racial harassment against community members or reporting a customer's racially derogatory comment, doesn't qualify as conduct opposing an *employer's* unlawful employment practice.  Thus, plaintiff fails to establish a triable issue on the first prong of the prima facie case.  But, even if plaintiff could establish protected opposition to discrimination, plaintiff's Title VII claim still couldn't withstand summary judgment, for reasons explained in the next section.

**2. Even if plaintiff could establish a prima facie case, her Title VII claim couldn't withstand summary judgment.**

Summary judgment also is appropriate against plaintiff's Title VII retaliatory harassment claim for the same reasons the court grants summary judgment against her Title IX retaliatory harassment claim. Courts generally analyze "Title IX discrimination claims under the same legal analysis as Title VII claims." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021) (quoting *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001)); *see also Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 832 (10th Cir. 1993) (Title VII is "'the most appropriate analogue when defining Title IX's substantive standards'") (quoting *Mabry v. State Bd. of Cmty. Colls. & Occupational Educ.*, 813 F.2d 311, 316 n.6 (10th Cir. 1987)).

Here, the court analyzes plaintiff's Title IX retaliatory harassment claim using the standard set forth in *Adcox v. Brennan*, No. 15-CV-9258-JWL, 2017 WL 2405326, at *7 (D. Kan. June 2, 2017). In *Adcox*, this court assessed a Title VII retaliatory harassment claim applying the *McDonnell Douglas* framework. *Id.* Below, in Part III Section D, the court concludes that plaintiff's retaliatory harassment claim fails under Title IX (applying the same standard it would apply to a Title VII retaliatory harassment claim).[9] Plaintiff fails to establish a

---

[9]       At first, it may seem odd that the same activity presents a triable issue of protected activity under Title IX but doesn't present a triable issue of protected opposition under Title VII. But the two anti-discrimination statutes provide the explanation. It's a simple one. The two laws differ in an important way. Title IX is a more broadly written, general anti-discrimination law. In contrast, Title VII explicitly prohibits retaliation for opposing unlawful employment practices *and* enumerates those unlawful employment practices. The Supreme Court explained the difference this way: "Unlike Title IX, § 1981, § 1982, and the federal-sector provisions of the ADEA, Title VII is a detailed statutory scheme. This statute enumerates specific unlawful employment practices." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 356 (2013). The Court thus held that courts couldn't apply "default rules" used for broad anti-discrimination statutes to Title VII because of "Congress' special care in drawing so precise a statutory scheme[.]" *Id.* at 356–57 (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (distinguishing Title IX's "broadly written general prohibition on discrimination" from Title VII's "greater detail [with respect to] the conduct that constitutes discrimination")).

prima facie case under the materially adverse action prong for Principal Skretta's behavior toward her.  Her case for the formal letter of concern and defendant's decision not to hire her fail at the pretext step in the *McDonnell Douglas* analysis.  Thus, the court holds that even if plaintiff could establish protected activity under Title VII, her claim still would fail at the summary judgment stage.

Thus, the court grants summary judgment against plaintiff's Title VII retaliatory harassment claim for two reasons.  First, plaintiff has failed to come forward with summary judgment facts presenting a jury question whether she engaged in protected activity under Title VII.  Second, even if plaintiff could establish a prima facie claim for Title VII retaliatory harassment claim, it wouldn't survive summary judgment for the same reasons her Title IX retaliatory harassment claim didn't.

### B. Plaintiff's Title IX claims

Plaintiff makes two kinds of retaliation claims under Title IX.  First, she asserts a run-of-the-mill retaliation claim.  Doc. 43 at 10 (Pretrial Order ¶ 4.a.2).  Second, like her Title VII claim, she asserts a claim for retaliatory harassment predicated on Title IX.  *Id.*  Defendant responds to both claims with a threshold argument, *i.e.*, plaintiff's Title VII claim pre-empts both of her Title IX claims.

The court already has rejected this pre-emption argument.  And the same analysis applies with equal force to its summary judgment iteration.  Repeating that full analysis again won't contribute any efficiency or substance to the court's work, so the court merely adopts the analysis and conclusions in its earlier Order.  *See* Doc. 27 at 11–14.  So, to the extent defendant bases its summary judgment motion on Title VII pre-emption, the court denies the motion for the same reasons stated therein Doc. 27.  *See id.* (concluding that Title IX claims not pre-empted

because Title IX and Title VII claims can apply concurrently to employment discrimination suits due to the differences between the two statutes).

Turning to the substance of the Title IX claims, they generally retrace the steps of her Title VII claim.  She claims that defendant retaliated against her for reporting that one of the district's students had claimed she was sexually assaulted by another student.  This retaliation, plaintiff claims, consisted of:  (a) Principal Skretta allegedly harassing her; (b) defendant failing to stop the Principal's harassment; and (c) defendant failing to promote her.  Doc. 43 at 10 (Pretrial Order ¶ 4.a.2.).  The court's analysis begins with another threshold dispute—this time, the parties disagree whether *McDonnell Douglas* burden shifting applies.  Part 1 decides that issue.  Concluding that *McDonnell Douglas*'s model does apply, Part 2 turns to the prima facie case.

### 1.  Burden shifting framework

Title IX of the Education Amendments Act of 1972 prohibits discrimination "on the basis of sex" in educational programs that receive federal funds.  20 U.S.C. § 1681(a).  This prohibition covers employment discrimination, *Throupe*, 988 F.3d at 1251, and retaliation against individuals who report discrimination, *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017).  "'[C]ourts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims.'"  *Throupe*, 988 F.3d at 1251 (quoting *Gossett*, 245 F.3d at 1172).  So, courts apply the familiar *McDonnell Douglas* burden shifting framework to Title IX claims, unless the plaintiff has adduced direct evidence of discrimination.  *See id.*; *see also Doe v. Univ. of Denver*, 1 F.4th 822, 829 (10th Cir. 2021) ("Where a Title IX plaintiff relies on indirect proof of discrimination, we apply the three-part burden-shifting framework announced in *McDonnell Douglas*"); *Hiatt*, 858 F.3d at 1315 n.8 ("The *McDonnell Douglas*

33

framework applies" to "Title IX sex discrimination claims."); *Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1007–08 (10th Cir. 1990) ("'[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.'" (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985))).

      Plaintiff argues that the burden-shifting framework doesn't apply to her because she has adduced direct evidence of discrimination. "Direct evidence is evidence that, on its face, demonstrates that the employment decision was reached for discriminatory reasons." *Didier v. Abbott Labs.*, 614 F. App'x 366, 372 (10th Cir. 2015) (citing *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002)). "The classic example of direct evidence of discrimination comes from *Trans World Airlines*, where the Supreme Court held that an explicit, mandatory age requirement was direct evidence of age discrimination." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *Trans World Airlines*, 469 U.S. at 121). "[I]f the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence." *Id.* (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007)).

      Plaintiff claims she has unearthed two forms of direct evidence of discrimination: first, that Principal Skretta admitted he issued a written reprimand because plaintiff reported the sexual assault; and second, that Principal Skretta admitted to requesting the school district move plaintiff from his building because she had reported the student's alleged sexual assault. The testimony plaintiff cites to support her first assertion doesn't qualify as direct evidence. Dr. Skretta testified that "one of the reasons in [his] letter of concern to [plaintiff] is that she went to Student Services before coming to [him] about that alleged sexual assault[.]" Doc. 61-4 at 14 (Skretta Dep 79:18–24). Thus, Principal Skretta testified that he issued the letter of concern to

plaintiff because she didn't report a behavioral incident involving a special education student to him before contacting Student Services.  This testimony on its face is not evidence of direct discrimination.  Instead, it's evidence from which a reasonable factfinder could find or infer that Principal Skretta sent the letter of concern for legitimate, non-retaliatory reasons—*i.e.* because plaintiff failed to report the incident to him before contacting Student Services.  So, it doesn't meet *Tabor*'s requirement that a factfinder only could interpret it in one way.  *See Tabor*, 703 F.3d at 1216.

Trying to support her second direct evidence assertion, plaintiff cites an email that Principal Skretta sent expressing his concerns about plaintiff remaining on his administration team and his lack of trust in her.  Doc. 61-4 at 23–25 (Skretta Dep. 124:22–125:18, 129:18–130:6).  Later, Principal Skretta testified that he made this request and distrusted plaintiff because of how she handled reporting the sexual assault to Student Services.  *Id.*  This testimony, on its face, isn't evidence of direct discrimination.  The principal's statements have a plausibly benign explanation—that he didn't trust plaintiff and didn't want to work with her because she hadn't followed the chain of command for reporting, as he believed she should have.  It requires several inferences to conclude that Principal Skretta acted because plaintiff had reported a student sexual assault (rather than because she mishandled reporting, it in his view).  At the very least, this testimony, on its face, doesn't show that defendant took any employment action for a discriminatory reason.  Since a reasonable factfinder plausibly could interpret both statements in a benign fashion, neither statement qualifies as direct evidence of discrimination.  *See Tabor*, 703 F.3d at 1216.

These conclusions mean that the court must assess the case under the traditional burden shifting rubric.  This assessment follows, starting with the prima facie case.

### 2.  Prima facie case

The parties don't identify a Tenth Circuit case that explicitly states the elements of a prima facie case for retaliation under Title IX.  But this court has identified those elements.  To state a claim for retaliation under Title IX, plaintiff must allege that:  "1) he or she engaged in protected activity; 2) defendant had knowledge of the protected activity; 3) materially adverse school-related action was taken against plaintiff; and 4) there was a causal connection between the protected activity and the adverse action."  *Tackett v. Univ. of Kan.*, 234 F. Supp. 3d 1100, 1109 (D. Kan. 2017) (citing unpublished decisions by the Third and Sixth Circuits).[10]

### a.  Protected activity

Plaintiff asserts she reported an alleged sexual assault of a female student by another student to defendant's Director of Student Services and to Principal Skretta.  Reporting sexual assault or harassment of a student by another student qualifies as protected activity under Title IX.  *See Douglass v. Garden City Cmty Coll.*, 543 F. Supp. 3d 1043, 1054 (D. Kan. 2021) ("Title IX's enforcement scheme depends on individual reporting and accordingly protects from retaliation individuals who witness and report discrimination."); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 180 (2005) ("Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished."); *id.* at 174 (holding "that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX."); *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 642

---

[10]      Our court explained that "the Tenth Circuit does not appear to have expressly set forth the elements for a retaliation claim under Title IX[,]"  and "[c]ourts that have addressed the issue have analyzed both Title IX discrimination and retaliation using Title VII standards."  *Id.* at 1108–09 (citing *Yan Yan v. Penn State Univ.*, 529 Fed. App'x 167, 171 (3d Cir. 2013); *Scott v. Metro. Health Corp.*, 234 Fed. App'x 341, 346 (6th Cir. 2007)).

(1999) (holding that Title IX private right of action encompasses intentional sex discrimination in the form of a recipient's deliberate indifference to sexual harassment of a student by another student).  Plaintiff has demonstrated that she can present a triable issue on the first prong of the prima facie case for Title IX retaliation.

### b.  Defendant's knowledge of protected activity

Defendant next argues that plaintiff can't show defendant had knowledge that plaintiff had engaged in activity protected by Title IX.  Plaintiff's response claims that defendant knew of plaintiff's report about the sexual assault and also knew about plaintiff's complaint that Principal Skretta had retaliated against her.  Defendant disputes that it possessed such knowledge because Principal Skretta was not "an official who at minimum ha[d] the authority to address the alleged discrimination and to institute corrective measures on the [school district's] behalf[,]" and so, defendant argues, his knowledge is not imputed onto the district.  Doc. 49 at 65 (quoting *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 290–91 (1998)).

The court does not need to determine whether Principal Skretta's knowledge suffices because the summary judgment facts include evidence that plaintiff informed other school district officials about the protected activity around the same time as Principal Skretta.  On March 21, 2019, plaintiff reported the student sexual assault to defendant's director of Student Services.  On March 31, 2019, plaintiff complained about Principal Skretta's behavior to defendant's HR representative.  Defendant doesn't dispute that these representatives of the school district who plaintiff reported to qualify as persons possessing authority to address the alleged retaliation.  Therefore, plaintiff has established a triable issue on the second prong of the prima facie case—defendant's knowledge of both her report of the student sexual assault and her report of Principal Skretta's alleged retaliation and harassment of her.

### c. Materially adverse action

For the third prong of the prima facie recipe—"materially adverse" action by the school district against plaintiff—an action is "materially adverse" if it is "sufficiently severe or pervasive that it could well dissuade a reasonable worker from engaging in protected activity." *Adcox v. Brennan*, No. 15-cv-9258-JWL, 2017 WL 2405326, at *7 (D. Kan. June 2, 2017) (first citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); then citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1217–19 (10th Cir. 2008)).  In contrast, "petty slights, minor annoyances, and simple lack of good manners" generally will not rise to the level of materially adverse action.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Unal v. Los Alamos Pub. Schs.*, 638 F. App'x 729, 743 (10th Cir. 2016).  Plaintiff relies on three things for her argument that she can satisfy this third prong.  Two of them are specific actions by defendant.  The third is something of a residuary, collecting a series of events (or perceptions) that allegedly followed an April 1, 2019, meeting between plaintiff, Principal Skretta, and another representative of the school district.  The court addresses all three arguments, below.

### i. Principal Skretta's "letter of concern"

Plaintiff's first argument relies on a "formal letter of concern" addressing plaintiff's handling of incidents involving student D.S. during February and March of 2019.  Specifically, the summary judgment facts establish, plaintiff made an entry in D.S.'s disciplinary record on the software system used by the school district—a system known as Infinite Campus.  In general terms, Principal Skretta's letter of concern expressed his belief that plaintiff should have entered the information about D.S.'s conduct into Infinite Campus much closer in time to the February event she eventually reported.  The principal also explained his concern that plaintiff's "late" entry of the incident was unethical.  *See* Doc. 49-22 at 11–12 (Skretta Dep. 64:36–65:19).  This

letter of concern also addressed another incident involving the same student.  In particular, Principal Skretta expressed concern that plaintiff had consulted with the district's Student Services Office about the incident involving D.S. before she reported it to him.  *See id.* at 40 (Skretta Dep. 191:4–21); Doc. 49-44 (Ex. 44 Letter of Concern).

The court assumes that placing such a formal letter in an employee's file could qualify as materially adverse action.  That is, its effect could "dissuade a reasonable worker from engaging in protected activity."  *Adcox*, 2017 WL 2405326, at *7 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  It thus declines defendant's invitation to conclude that this action can't sustain the third prong of plaintiff's prima facie case.

### ii.    Defendant's failure to hire

The court reaches the same conclusion about plaintiff's reliance on defendant's decision not to hire plaintiff as a school principal.  The court assumes that such a decision, if proved at trial, could satisfy the third prong of the prima facie standard.  Indeed, defendant does not even argue for a contrary result.

### iii.    Principal Skretta's "subsequent conduct"

Plaintiff's third argument of retaliation relies on a collection of events (or, in some cases, her perceptions) following an April 1, 2019 meeting involving her and school district administrators.  In short form, plaintiff sent a March 31 email to two of the district's HR representatives and Principal Skretta's supervisor.  The email referenced what plaintiff termed the principal's "formal write up" of plaintiff—*i.e.*, the letter of concern.  This message precipitated a meeting the next day—on April 1—among plaintiff, Principal Skretta, and his supervisor.  Plaintiff characterizes the meeting as one where Principal Skretta became "very

upset, very angry, and very curt." Doc. 61-1 at 21 (Kincaid Dep. 119:22–120:20). The third form of alleged retaliation focuses on Principal Skretta's treatment of her after this meeting.

In her Opposition to defendant's motion, plaintiff claims that Principal Skretta's "retaliatory harassment of [her] that began immediately with the written reprimand" and continued for more than a year and "cumulatively" amounts to "adverse employment action." Doc. 61 at 105 (Pl.'s Opp'n). This Opposition asserts an inventory of the alleged actions:

> (1) "[Principal] Skretta spoke down to Plaintiff at 20 meetings," according to one witness;
>
> (2) "he stopped talking to her[;]"
>
> (3) and, according to plaintiff, he "pretend[ed] she was not there[.]"
>
> (4) Principal Skretta "spoke angrily" when plaintiff "opposed the retaliatory reprimand[;]"
>
> (5) he "require[d] her to be punctual but let her colleague come and go as she pleased[;]"
>
> (6) he "blame[d] [her] for conduct that was not her fault, chronically f[ou]nd fault in her work[;]"
>
> (7) "and [he] gave her duties to other employees to avoid her," according to another witness.
>
> (8) Principal Skretta "deprive[d] [plaintiff] of district information that undermined her ability to instruct her subordinates and parents[;]"
>
> (9) he "prepared a blank evaluation" of plaintiff; and
>
> (10) Principal Skretta "repeatedly requested that [plaintiff] be moved from his building, saying she could not be trusted . . . and otherwise maligned her during the investigative process with irrelevant rumors."

*Id.* at 104–05.

Defendant responds to this list, arguing that these actions and perceptions cannot qualify as materially adverse actions capable of supporting the third prong of plaintiff's prima facie case

for her Title IX claim.  The court analyzes defendant's argument below, beginning with an

overview of the controlling legal standard (subpart (a)).  The court then applies (in subpart (b))

that legal standard to plaintiff's list of purportedly retaliatory conduct.

### (a) What conduct qualifies as materially adverse action?

The Supreme Court's opinion in *Burlington Northern & Santa Fe Railway Co.* provides

the legal standard controlling the definition of materially adverse action in a retaliation case.

While *Burlington* was a Title VII case, *see* 548 U.S. 53, 59 (2006), neither party contends that a

different standard applies to retaliation claims made under Title IX.  The court thus applies that

case's standard to plaintiff's retaliation claim.  As *Burlington* explains, statutory protection

against retaliation

> protects an individual not from all retaliation, but from retaliation
> that produces an injury or harm.  As we have explained, the Courts
> of Appeals have used differing language to describe the level of
> seriousness to which this harm must rise before it becomes
> actionable retaliation. . . .  In our view, a plaintiff must show that a
> reasonable employee would have found the challenged action
> materially adverse, which in this context means that it well might
> have dissuaded a reasonable worker from making or supporting a
> charge of discrimination.
>
> We speak of *material* adversity because we believe it is important
> to separate significant from trivial harms.  Title VII, we have said,
> does not set forth a general civility code for the American
> workplace.  An employee's decision to report discriminatory
> behavior cannot immunize that employee from the petty slights or
> minor annoyances that often take place at work and that all
> employees experience.

548 U.S. at 67–68 (citations and internal quotation marks omitted).  The balance of Justice

Breyer's opinion emphasizes three important aspects of this standard.

*First*, *Burlington* adopts an objective standard, *i.e.*, using the "reactions of a *reasonable*

employee." *Id*. at 68.  This approach thus "avoids the uncertainties and unfair discrepancies that

can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id*. at 68–69.
*Second*, "[c]ontext matters." *Id*. at 69. So, a supervisor's decision not to include an employee in
a lunch "is normally trivial, a nonactionable petty slight." *Id*. But by contrast, "excluding an
employee from a weekly training lunch that contributes significantly to the employee's
professional advancement might well deter a reasonable employee from complaining about
discrimination." *Id*. at 69. *Last*, *Burlington*'s standard focuses "on the materiality of the
challenged action[,]" and not "the underlying conduct" furnishing the basis of the retaliation
claim. *Id*. at 69–70. This focus empowers courts to "screen out trivial conduct while effectively
capturing those acts that are likely to dissuade employees from complaining or assisting" with
complaints about discrimination. *Id*. at 70.

Next, the court applies this legal standard to evidence that, plaintiff contends, affected her
in the manner and to the degree required by *Burlington*.

> **(b) Applying this standard to plaintiff's claims here, some of
> defendant's alleged conduct can support a finding of material,
> adverse action.  But other conduct cannot.**

*Burlington*'s legal standard frames the ultimate question asked by the adverse action
prong of the prima facie case: How would a reasonable employee react to the employer's
allegedly adverse action? Would the employer's action dissuade a "reasonable worker" from
engaging in the protected activity? And because "[c]ontext matters" so much to the correct
analysis, 548 U.S. at 69, the court must ask that question in the particular context of the protected
activity at issue.

But these are the ultimate questions that a jury would have to decide after a trial. The
current motion comes at summary judgment, and so the current question is one for the court to
answer. And it asks the summary judgment version of the question: Could a reasonable jury

find that defendant took *any* action that is material enough to dissuade a reasonable Assistant

Principal from reporting an allegation of student-on-student sexual assault at plaintiff's school?

If the answer is no, then plaintiff can't satisfy the third prong of her prima facie case. And under

the *McDonnell Douglas* framework, no prima facie case means no trial.

Defendant has assumed that one of its actions—failing to promote plaintiff to a

Principal's position—can satisfy the standard for materially adverse action. The court has

concluded that another one of defendant's actions—Principal Skretta's "letter of concern"—also

can provide the requisite materially adverse action. But the analysis can't stop there because

plaintiff contends that ten other actions by Principal Skretta also amount to materially adverse

action. Defendant disputes all ten. The disagreement over these ten actions affects other aspects

of the summary judgment analysis, so the court addresses all of the actions that remain in

dispute. As the following paragraphs explain, a reasonable jury could find that some of the ten

actions meet *Burlington*'s standard. Others do not.

Specifically, and on the summary judgment facts, no reasonable jury could find that the

first five of the challenged actions meet the *Burlington* standard. That Principal Skretta (1)

"spoke down to" plaintiff during 20 meetings, (2) "stopped talking to" her, (3) "pretend[ed]

[plaintiff] was not there[,]" (4) "spoke angrily" to plaintiff when she "opposed the purportedly

retaliatory reprimand[,]" and (5) "require[d] her to be punctual but let her colleague come and go

as she pleased"[11] are not conduct prohibited by Title IX's mandate forbidding retaliation. That's

---

[11]     While a supervisor "singling out" an employee for "heightened scrutiny" about her attendance
could in some contexts be materially adverse, requiring an employee to be punctual without more cannot
amount to a materially adverse action. *Adcox*, 2017 WL 2405326, at *8 (supervisor who "unreasonably
denied [plaintiff's] leave requests and required her to submit medical documentation to support sick leave
requests" in addition to 25 pre-disciplinary interviews over the course of roughly 18 months following her
first EEO complaint could amount to materially adverse action). Plaintiff testified that Principal Skretta
spoke with her about arriving late to work. Doc. 49-68 at 110–111 (Kincaid Dep. 209:5–211:21). But,
she conceded that he never disciplined or wrote up plaintiff about her attendance. *Id.* Plaintiff also

not to say that such treatment—assuming it occurred—models good management or represents acceptable adult conduct.  It doesn't.  But Title IX, like Title VII, doesn't adopt "a general civility code" regulating the American workplace.  Instead, these acts provide statutory protection for those who engage in protected activity.  And in the particular context of these summary judgment facts here, no reasonable jury could find that any of these first five actions would dissuade a reasonable Assistant Principal from reporting that one of her students purportedly has assaulted another student while at school.

The Title IX retaliation precedents establish as much.  This is so in our Circuit.  *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1219 (10th Cir. 2008) (applying *Burlington* to affirm summary judgment against material adverse action argument in Title VII retaliation based on "negative comments, condescending looks, perceived exclusion from hiring and firing decisions, and a reduction in the administrative authority").  As it is true in other circuits as well.  *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) (affirming summary judgment against retaliation claims where defendant's managers "wrongly accused" plaintiffs of behaving like "cry bab[ies]" and "troublemakers" and, for one plaintiff, a "spoiled child"); *see also Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 932–33 (8th Cir. 2011) (affirming summary judgment against retaliation claim because treating plaintiff "with disrespect," "refus[ing] to acknowledge her in common greetings," and "demean[ing]" plaintiff by "offering her a piece of candy [that her manager] had in his mouth" are not adverse actions that "would deter a reasonable employee from making a charge" of discrimination).

Nor is the court persuaded by plaintiff's argument aggregating these five actions, claiming that they—"cumulatively"—amount to adverse action.  *See* Doc. 61 at 105 (Pl.'s

---

testified that she has had other supervisors talk to her about absences and arriving late for work.  Doc. 49-68 at 111–12 (Kincaid Dep. 211:22–212:9).

Opp'n).  Our Circuit has rejected arguments that combine a series of petty slights and view them in the "aggregate to produce material and adverse actions" against employees.  *Somoza*, 513 F.3d at 1219 (affirming summary judgment against Title VII claims because, in part, "it cannot be said that negative comments, condescending looks, perceived exclusion from hiring and firing decisions, and a reduction in administrative authority . . . aggregate to produce material and adverse actions").  To say it simply, adding five zeroes to one another just produces another zero.  In sum, none of these five actions—items (1), (2), (3), (4), and (5)—can support a finding of material adverse action.

In contrast, the court isn't persuaded by defendant's attack on the other five actions argued by plaintiff.  If, for example, a reasonable jury were to conclude that Principal Skretta had "deprive[d] [plaintiff] of district information that undermined her ability" to do her job, issued plaintiff a blank performance evaluation that injured her employment prospects, and gave plaintiff's duties away to other employees, such conduct could support a finding of material adverse action.  *See, e.g.*, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88–92 (2d Cir. 2015) (teacher's additional workload, more challenging students, and negative performance evaluation could amount to actionable actions); *see also Adcox*, 2017 WL 2405326 at *8 (giving plaintiff more arduous work can support a finding of adverse action).  On the current record, defendant has failed to persuade the court that no reasonable jury could find Principal Skretta's other actions after their April 1, 2019 meeting qualify as material adverse action.  The court thus holds, for now, these alleged actions help plaintiff sustain her burden on the third prong of this prima facie case.[12]

---

[12]    The court has significant reservations about some of plaintiff's contentions.  For instance, plaintiff complains that Principal Skretta "repeatedly requested that she be moved from his building, saying she could not be trusted[.]"  *See* Doc. 61 at 105.  But plaintiff hasn't adduced facts to show that she even knew about these requests before receiving discovery in this case and there's no evidence that

### d. Causal connection between protected activity and materially adverse action

The court next considers if plaintiff can present a triable issue whether a causal connection exists between her report of the student-on-student sexual assault and the materially adverse actions that still stand—Principal Skretta's letter of concern, the remaining five alleged actions of Principal Skretta toward plaintiff after their April 1, 2019 meeting, and the school district not promoting her.

At this stage of the analysis, defendant argues that plaintiff's retaliation claim cannot survive summary judgment because plaintiff failed to present evidence permitting a reasonable jury to conclude that plaintiff's report of the sexual assault caused:  (a)  Principal Skretta to issue the letter of concern; (b) any actionable harassment by Principal Skretta; or (c) defendant not to hire plaintiff for one of the elementary school principal positions.  And even if she had presented such evidence, defendant argues it can provide legitimate reasons for those three actions. Defendant further argues that no reasonable jury could conclude that its reasons are pretextual. The court assumes, without deciding, that the summary judgment record could support a reasonable jury finding that a causal link exists.  And for the reasons explained below, the court finds that the summary judgment record—even when viewed in the light most favorable to plaintiff—establishes that Principal Skretta's reasons for issuing the formal letter of concern and his allegedly harassing, subsequent behavior were legitimate and not a pretext for retaliation. The record also establishes that defendant's reasons for hiring principal candidates other than plaintiff were legitimate and not a pretext for retaliation.

---

plaintiff was transferred because of these requests. *See Burlington*, 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").  Likewise, plaintiff complains that Principal Skretta left her evaluation blank.  But this fact, by itself, doesn't do much to suggest how a blank evaluation would deter a reasonable Assistant Principal from reporting a student's sexual assault.

### 2.  Legitimate, non-retaliatory reasons

If plaintiff meets the prima facie burden, then the burden shifts to defendant at the second phase of *McDonnell Douglas*.  *See Jones*, 349 F.3d at 1266.  This stage requires defendant to produce a legitimate, non-retaliatory reason for its employment action.  *Id*.  At this stage, defendant only is required to explain its actions against plaintiff in terms that are not facially prohibited by Title IX.  *See id.* (citing *EEOC v. Flasher Co., Inc.*, F.2d 1312, 1317 (10th Cir. 1992)).  At this second stage, defendant argues that it has come forward with legitimate reasons for both Principal Skretta's letter of concern and defendant's decision to hire other individuals instead of plaintiff for elementary principal positions.  Our Circuit has explained that defendant, at the second step, doesn't "'need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.'"  *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quoting *Flasher*, 986 F.2d at 1316).  "'[T]his stage of the analysis only requires the defendant to articulate a reason for the [employment decision] that is not, on its face, prohibited' and that is 'reasonably specific and clear.'"  *Id.* (first alteration in original) (quoting *Flasher*, 986 F.2d at 1316 & n.4).

### a.  Legitimate reasons for letter of concern

Here, defendant asserts—and the summary judgment facts establish—that Principal Skretta had legitimate reasons to issue the March 29, 2019 formal letter of concern.  Principal Skretta issued the letter to reprimand plaintiff for (a) mishandling reporting the February 4, 2019 incident with student D.S.; and (b) not reporting to him the March 19, 2019 incident with a special education student before going to Student Services about it.  A few weeks before issuing

the letter, Principal Skretta had informed plaintiff that he would take over the SPED program at Central Middle School because he needed to monitor special education students directly.

In that context, Principal Skretta's concern about plaintiff's actions—imposing discipline on D.S., a special needs student, without first telling him and repeatedly failing to loop him in on communication with school district officials about student D.S.'s discipline hearing and punishment—was legitimate. Principal Skretta's motivation to issue plaintiff a letter of concern and clarify expectations about plaintiff's duty to report directly to him any incident about special education students at the school constitutes a legitimate, non-retaliatory reason. For those reasons, the summary judgment facts establish defendant satisfied its burden to show a legitimate reason for issuing the letter of concern.

### b. Legitimate reasons for Principal Skretta's behavior toward plaintiff

Defendant argues that it had legitimate, non-retaliatory reasons for any materially adverse actions that—according to plaintiff—constitute harassment in the aggregate. In response to some of these allegations, defendant provides a specific legitimate, non-retaliatory reason for Principal Skretta's behavior. In response to others, it does not. Instead, defendant asserts that Principal Skretta took "each action . . . for the legitimate non-retaliatory reasons set forth in his testimony or the documentary evidence." Doc. 74 at 88–89 (citing defendant's facts ¶¶ 128–36 (reasons for issuing letter of concern), 196–98 (reasons for fire alarm email), 204–10 (reasons for 911 email), 223–35 (reasons for incomplete evaluation), and defendant's Ex. 49-52 (evaluation)). For the remaining five allegations of materially adverse action (6–10), the court assesses each of defendant's asserted legitimate, non-retaliatory reasons, below.

(6) Principal Skretta "blame[d] [her] for conduct that was not her fault, chronically f[ou]nd fault in her work[;]"

Plaintiff argues that Principal Skretta singled her out by sending emails criticizing her work and that these emails were a pretext for retaliation. Defendant responds, arguing that "[e]ach email sent by Dr. Skretta was sent for the purpose [set] forth in the email—*i.e.*, if the email indicated that he wanted to be informed when a 911 call was made from his building, that is precisely why the email was sent." Doc. 49 at 70–71. Thus, defendant argues, Principal Skretta had legitimate, non-retaliatory reasons to send these emails, so, they aren't a pretext for retaliation.

*First*, on February 9, 2020, Principal Skretta emailed plaintiff after he learned about a fire alarm at the school, and she hadn't notified him of it. Doc. 49-49; *see also* Doc. 61-1 at 31 (Kincaid Dep. 184:11–185:21). He requested that plaintiff inform him, in the future, of a fire alarm if he was off campus when it occurred. *Id.* Second, on February 24, 2020, Principal Skretta emailed plaintiff and the other assistant principal about plaintiff calling 911 and not informing him that she had done so. Doc. 49-50 (Ex. 50); *see also* Doc. 61-1 at 31–32 (Kincaid Dep. 187:23–190:8). Principal Skretta requested that both assistant principals, in the future, notify him as soon as possible if someone at the school called 911. *Id.*

Defendant meets its burden to provide a legitimate, non-retaliatory reason for these two emails based on Principal Skretta's testimony and the emails themselves. These two emails— expressing concern over a fire alarm at the school (Doc. 49-49) and concern over plaintiff making a 911 call (Doc. 49-50)— explained Principal Skretta's expectations how a number of administrators (not just plaintiff) should handle those types of situations.

(7) "and [Principal Skretta] gave her duties to other employees to avoid her," according to another witness;

Plaintiff asserts that Principal Skretta "gave her duties to other employees to avoid her[.]" Doc. 61 at 105.  To support this assertion, plaintiff cites facts from her Opposition, (Pl.'s Additional Facts ¶¶ 21, 27–39, 77).  These facts only support a narrower allegation:  Principal Skretta gave some of plaintiff's duties to Assistant Principal Estes because he didn't want to talk to plaintiff.  Doc. 61 at 85 (Pl.'s Opposition ¶ 33) (citing Doc. 61-8 at 5 (Estes Dep. 31:11–17)).  Assistant Principal Estes testified that Principal Skretta delegated some of plaintiff's duties to her "[b]ecause he did not want to talk to" plaintiff.  Doc. 61-8 at 5 (Estes Dep. 31:11–17)).  When asked about Principal Skretta's demeanor toward plaintiff after her report of the student-on-student sexual assault, Ms. Estes testified that "he pretty much didn't like [plaintiff] all year long. The whole time we were there, he pretty much didn't like her."  *Id.* (Estes Dep. 30:14–20).  And this behavior started "prior" to plaintiff's report, "as soon as [Principal Skretta and plaintiff] started working together[.]"  *Id.* (Estes Dep. 30:14–24).  Plaintiff's allegation itself includes a legitimate, non-retaliatory reason for Principal Skretta's delegating her duties—to avoid her because he didn't like her.  Ms. Estes' testimony supports this legitimate reason—one that was present both before and after plaintiff made the sexual assault report.  Thus, his behavior couldn't qualify as retaliatory for an incident that hadn't yet occurred.  And this testimony demonstrates a weakness in the causal prong for his behavior as well.

(8) Principal Skretta "deprive[d] [plaintiff] of district information that undermined her ability to instruct her subordinates and parents[;]"

Plaintiff alleges that Principal Skretta withheld information from her that he should've provided during principal meetings, setting her up to fail and undermining her ability to inform her subordinates about the school.  She testified that he excluded her from meetings, and thus she

couldn't "tell [her] staff members what [was] going on" at the school.  Doc. 61-1 at 44–45

(Kincaid Dep. 312:2–313:14).  When asked about meetings that he failed to invite plaintiff to

attend, Principal Skretta testified that he probably didn't always communicate adequately.  Doc.

61-4 at 24 (Skretta Dep. 126:13–23).

Defendant asserts an overarching legitimate, non-retaliatory theory for Principal Skretta's

behavior:  he functioned as a disorganized manager both before and after plaintiff's report of the

student-on-student sexual assault and he behaved this way towards all the employees he

managed, not just plaintiff.  *See* Doc. 49 at 71; Doc. 74 at 82.  A couple of Principal Skretta's

subordinates, in addition to plaintiff, testified that he was an unpleasant manager and an

"ineffective" communicator, Doc. 49-29 at 6 (Votypka Dep. 38:3–20), and that they did not get

along with him well, *see id.* at 10–11 (Votypka Dep. 49:22–50:1); Doc. 49-31 at 12–13 (Estes

Dep. 59:9–60:1).  Central Middle School had "environment" and "leadership issues."  Doc. 49-

31 at 13 (Estes Dep. 60:2–12).  Thus, defendant argues, Principal Skretta's behavior and failures

to communicate were not retaliatory or limited to plaintiff.  Defendant satisfies its burden at this

stage—explaining Principal Skretta's actions against plaintiff in terms not facially prohibited by

Title IX.  *See Jones*, 349 F.3d at 1266.

(9) he "prepared a blank evaluation" of plaintiff;

Plaintiff asserts that Principal Skretta issued her a blank performance evaluation to

retaliate against her.  Defendant responds, arguing that Principal Skretta gave plaintiff a blank

evaluation "because he didn't get it done by the deadline and, because he himself received an

incomplete one, [so he] thought it would be acceptable to give [p]laintiff and the other assistant

principal incomplete evaluations rather than none at all."  Doc. 49 at 71.  The summary judgment

facts establish that Principal Skretta didn't observe plaintiff in the classroom due to COVID-19,

consistent with his treatment of other employees that year.  Again, by providing a reason not facially prohibited by Title IX, defendant meets its burden of providing a legitimate, non-retaliatory reason.

> (10) Principal Skretta "repeatedly requested that [plaintiff] be moved from his building, saying she could not be trusted . . . and otherwise maligned her during the investigative process with irrelevant rumors."

On February 25, 2020, Principal Skretta emailed his supervisors requesting that they remove plaintiff from her position at his school.  Doc. 61-4 at 25 (Skretta Dep. 129:18–130:1). Defendant asserts—through the legitimate, non-retaliatory reasons set forth in Principal Skretta's testimony—the following reasons for this request:  Principal Skretta sent this email to express concerns about having plaintiff on his administrative team because he didn't trust plaintiff as she wouldn't communicate with him.  Doc. 49 at 30 (¶¶ 211–16); Doc. 61-4 at 25 (Skretta Dep. 129:18–130:1).  Principal Skretta testified that he was concerned that plaintiff wasn't a team player, and he lost trust in her communication skills after incidents like the fire alarm and how she handled reporting the student-on-student sexual assault incident.  *Id.*

Plaintiff perceived Principal Skretta's comments to his supervisors before and during his investigation as "malignment" of her character.  But, for the same legitimate non-retaliatory reasons that he requested her removal, he reported to his superiors that he didn't trust her and that he questioned her ability to work in a team and her character.

### c.  Legitimate reasons for hiring other individuals instead of plaintiff

Defendant asserts that it had legitimate, non-retaliatory reasons for hiring other individuals, and not plaintiff, for the principal positions to which she applied.  Defendant did not hire plaintiff for one of the five elementary school principal positions because the interviewers and the superintendent decided that the other applicants were more suitable candidates for the

elementary schools.  Defendant's interview process involved pre-screening questions, pre-interview projects, and interviews with certified administrators.  The interviewers calculated scores from the different steps and submitted the top candidates to the superintendent for a final decision.  Superintendent Dr. Charles Foust received a list of candidates and made a recommendation to the Board of Education for five individuals other than plaintiff.  Defendant asserts that it had legitimate reasons for hiring each of the five individuals it selected instead of plaintiff.  The court addresses defendant's reasons for hiring each candidate, below.

Defendant selected Victor Aguilar for the principal's position at Silver City Elementary in the Spring of 2019.  The school district had employed Mr. Aguilar since 2010.  Mr. Aguilar had years of experience as a middle school assistant principal and athletic director in the district.  Mr. Aguilar is Hispanic and a native Spanish speaker.  Defendant testified that it considered these characteristics important in its hiring decision because a high percentage of Hispanic students and Spanish-speaking families attend Silver City Elementary.  Plaintiff is not bilingual.  Doc. 49-5 at 2 (Miguel Decl. ¶ 17).

Defendant selected Dr. Cesar Alvarez for the principal's position at Francis Willard Elementary School.  Dr. Alvarez had worked as an assistant principal at an elementary school in Texas since 2016.  Dr. Alvarez is Spanish speaking and bilingual.  Defendant testified that because Dr. Alvarez is bilingual, he could "serve as a positive role model for the Spanish speaking students at Francis Willard Elementary School."  Doc. 49-5 at 2 (Miguel Decl. ¶ 16).  Again, plaintiff is not bilingual.  *Id.* (Miguel Decl. ¶ 17).

Defendant selected Dr. Brooke Brutto for the principal position at Lindbergh Elementary School.  In Spring 2019, defendant testified that Dr. Brutto had served successfully in her position as an instructional coach at Lindbergh Elementary School—the same school hiring for

the principal's position.  Doc. 49-5 at 2–3 (Miguel Decl. ¶¶ 18–20); Doc. 49-60 at 2 (Shaw Decl.

¶ 10).  Dr. Brutto also had experience working as an elementary principal and middle school

assistant principal in another school district.  Plaintiff never had worked at Lindbergh

Elementary and therefore lacked any established relationships with the building staff.  *See* Doc.

49-5 at 3 (Miguel Decl. ¶ 20)*.*

Defendant selected Karl Unger for the principal's position at Banneker Elementary

School.  Defendant established that Mr. Unger had elementary school experience that plaintiff

did not have.  *Id.* (Miguel Decl. ¶ 22).

Defendant selected Dr. Heather Calvert for the principal's position at Grant Elementary

School.  When she interviewed, Dr. Calvert already had worked as an elementary school

principal at a school in Topeka, Kansas and had held that position since 2016.  Defendant

testified that Grant Elementary School needed a "principal with a strong instructional foundation

at the elementary level" like Dr. Calvert to help improve test scores at the school.  Doc. 49-60 at

2 (Shaw Decl. ¶ 13).  Dr. Calvert had elementary school principal experience.  Plaintiff did not.

The court concludes that defendant has articulated reasonably specific and clear reasons

for each employment decision.  None of those reasons are facially prohibited.  They thus satisfy

defendant's burden at this step.  Thus, the court turns to the third step of the *McDonnell Douglas*

framework:  pretext.

### 3. Pretext

At the third step of *McDonnell Douglas*, a "plaintiff can show pretext by revealing

'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find

them unworthy of credence and hence infer that the employer did not act for the asserted non-

discriminatory reason.'" *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)

(quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).  When analyzing the

pretext question, the court doesn't "ask whether the employer's reasons were wise, fair or

correct[.]"  *Riggs*, 497 F.3d at 1118.  Instead, the court asks "whether the employer honestly

believed its reasons and acted in good faith upon them."  *Id.* at 1119.  So, the court considers

"the facts as they appeared to the person making the decision," and the court can't "second-guess

the employer's decision even if it seems in hindsight that the action taken constituted poor

business judgment."  *Id.*  "'The reason for this rule is plain:  [the court's] role is to prevent

intentional discriminatory . . . practices, not to act as a 'super personnel department,' second

guessing employers' honestly held (even if erroneous) business judgments.'"  *Id.* (quoting *Young

v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006)).

Plaintiff asserts that Principal Skretta's letter of concern and his subsequent behavior

towards her were pretexts to retaliate against plaintiff for reporting the sexual assault.  She also

argues that defendant's failure to hire her was a pretext for the same protected activity.  The

court now addresses each of plaintiff's pretext arguments.

### a.   Letter of concern was not a pretext for retaliation

Plaintiff asserts two reasons that Principal Skretta's letter of concern was a pretext for

retaliation—one, he admitted that he was retaliating against her and two, defendant admitted that

it should not have punished plaintiff for how she handled the situation (as she claims,

appropriately).  The court addresses both arguments, below.

First, plaintiff asserts that Principal Skretta's letter of concern was a pretext because

Principal Skretta "testified he gave [plaintiff] the reprimand for reporting the sexual assault."

Doc. 61 at 110.  Again, the record shows that Principal Skretta testified that "one of the reasons

in [his] letter of concern to [plaintiff] is that she went to Student Services before coming to [him] about that alleged sexual assault[.]"  Doc. 61-4 at 14 (Skretta Dep 79:18–24).  Principal Skretta's testimony does not highlight any "inconsistency" or "weakness" in his proffered legitimate reason for issuing the letter—out of concern that plaintiff did not report a special education student's behavioral incident to him first.  *See Garrett*, 305 F.3d at 1217 (internal citation and quotation marks omitted).  To the contrary, his testimony supports his proffered legitimate reason.

Second, plaintiff argues that the letter of concern was a pretext because defendant's corporative representative "admitted . . . that the reprimand should have never been issued."  *Id.* at 111.  This argument—that defendant shouldn't have issued the reprimand—even if true, doesn't demonstrate a pretext.  The court doesn't "ask whether the employer's reasons were wise, fair or correct" when analyzing the pretext question.  *Riggs*, 497 F.3d at 1118.  Instead, the court asks "whether the employer honestly believed its reasons and acted in good faith upon them."  *Id.* at 1119.  Plaintiff adduces no evidence to show that Principal Skretta did not honestly believe in his reasons for issuing the letter.  Nor has she adduced any evidence that he failed to act in good faith based on these reasons.  Thus, the court holds that plaintiff fails to present a triable issue of pretext for the formal letter of concern.

### b.  Principal Skretta's behavior wasn't a pretext for retaliation

Plaintiff's pretext argument doesn't address each individual allegation of Principal Skretta's retaliatory harassment behaviors.  Instead, it focuses first on the emails (about the 911 call, the fire alarm, and Principal Skretta's request to remove plaintiff from his building) and second, on Principal Skretta's "verbal retaliatory harassment."  Doc. 61 at 112–113.

Plaintiff argues that each of these three emails was a pretext for retaliation for reporting the student-on-student sexual assault.  First, the email about the fire alarm was pretextual, plaintiff argues, because plaintiff "was not in charge of the building at the time," and Ms. Estes—"who had not reported a sexual assault"— didn't get reprimanded.  Doc. 61 at 111 (citing Plaintiff's Additional Facts 67–68).  However, even if, as plaintiff argues, Principal Skretta should have sent the email to both assistant principals instead of just plaintiff, this fact doesn't highlight an inconsistency with his proffered reason for sending the email—reporting his concern that plaintiff should have communicated with him that she and others evacuated the building, on a day when he wasn't at the school.

Second, plaintiff argues that the email about contacting Principal Skretta before calling 911 was a pretext for retaliation because he "conceded that she did the right thing in the moment."  Doc. 61 at 112 (Pl.'s Opp'n citing Pl.'s Additional Facts ¶¶ 67–68).[13]  Plaintiff argues that Principal Skretta "concede[d] that calling 911 was appropriate and he only needed to be made aware as soon as possible after the fact."  Doc. 61 at 90 (Pl.'s Opp'n ¶ 69).  This testimony restates a legitimate, non-retaliatory reason for sending the email—to inform plaintiff to contact him as soon as possible after calling 911.  It doesn't demonstrate pretext.

Third, plaintiff argues that Principal Skretta's email to administrators asking them to remove plaintiff from his building was a pretext for retaliation because "[d]efendant's corporate representative testified that [Principal] Skretta supplied nothing that would justify such a request."  Doc. 61 at 112 (Pl.'s Opp'n citing Pl's Additional Fact ¶ 39).  This testimony doesn't challenge Principal Skretta's own good faith belief that he didn't trust plaintiff, questioned her

---

[13]     The facts plaintiff cites discuss the fire alarm email, not the 911 call.  But, the next fact, asserts that Principal Skretta "concedes that calling 911 was appropriate and he only needed to be made aware as soon as possible after the fact."  Doc. 61 at 90 (Pl.'s Opp'n ¶ 69).  The court assumes, plaintiff meant to cite to this fact.

communication skills and ability to work as a part of a team after she failed to follow his directions and the chain of command—his proffered legitimate reason for sending the email. Plaintiff fails to demonstrate a triable issue on pretext.

Plaintiff's second set of pretext arguments fares no better. She argues that Principal Skretta's "verbal retaliatory harassment" including "talking down" to plaintiff, "ignoring her[,]" "leaving her out of meetings," and "withholding information" constitute a pretext for retaliation. Doc. 61 at 112–113. Plaintiff asserts that defendant failed to provide any legitimate, non-retaliatory reason for Principal Skretta's behaviors. So, in turn, she didn't attempt to make any pretext arguments in this section of her brief. Instead, she reiterated a couple of arguments that this behavior, cumulatively, is materially adverse, and that a causal connection exists. *See id.* In short, plaintiff failed to show any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered legitimate reasons for Principal Skretta's behavior. *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal citation and quotation marks omitted).

### c. Defendant's decision not to hire plaintiff was not a pretext for retaliation

Plaintiff asserts five reasons that defendant's decision not to hire her was a pretext for retaliation. Doc. 61 at 109–10. The court addresses each one, in turn, below.

First, plaintiff argues that she was qualified and made it to the third round of interviews. While the summary judgment facts support a finding that plaintiff was qualified, this assertion does not present a triable issue of pretext. The fact that plaintiff was a qualified candidate doesn't reveal an inconsistency or weakness in defendant's proffered legitimate reasons for its decision to hire other candidates. Instead, the summary judgment record shows that defendant hired the other five candidates because it determined that they were best qualified for the open

positions.  No reasonable factfinder could find defendant's proffered reasons—for example, candidates' ability to speak Spanish, candidates' experience and fit with the school that was hiring—unworthy of credence.  This conclusion is particularly strong, given the specificity of defendant's explanations for these decisions.

Second, plaintiff asserts that Dr. Tucker-Nevels was one of the Instructional Improvement Officers who conducted interviews in 2019 and Jody Mitchell, one of defendant's HR representatives, also was involved in the interview process.  Dr. Tucker-Nevels acted as Principal Skretta's direct supervisor and approved the letter of concern Principal Skretta gave plaintiff in March of 2019.  Jody Mitchell received a copy of Principal Skretta's letter of concern in her HR role and received plaintiff's report of Principal Skretta's alleged retaliation after the letter of concern.  Thus, as plaintiff's theory goes, both individuals had knowledge of the letter of concern, so if either one was involved in the interview process, their knowledge of the letter might've influenced their decision making.  But plaintiff cites no evidence explaining Dr. Tucker-Nevels or Ms. Mitchell's involvement in her hiring decision.  Also, even if Dr. Tucker-Nevels or Ms. Mitchell was involved in the hiring decision, that does not present a triable issue whether defendant's proffered reasons were legitimate.  The interviewers, Dr. Shaw and Dr. Miguel, and the ultimate decision maker, Superintendent Foust, all testified that they did not know about plaintiff's report of the student sexual assault or Principal Skretta's letter of concern in her file.

Third, in the same vein, plaintiff asserts that neither Dr. Shaw nor Dr. Miguel interviewed plaintiff.  Doc. 61 at 110.  Instead, Dr. Tucker-Nevels interviewed plaintiff.  *Id.*  However, plaintiff testified that Dr. Shaw and Dr. Miguel interviewed her during the first round of interviews for the five open elementary principal positions.  Doc. 61-1 at 40 (Kincaid Dep.

267:9–268:11).  She testified that Dr. Shaw and Dr. Miguel also conducted her next round of

interviews.  *Id.* at 41 (Kincaid Dep. 270:17–271:20).  To support her assertion that Dr. Tucker-

Nevels interviewed plaintiff instead, plaintiff cites testimony from district representative, Ms.

Faircloth, who testified that Dr. Shaw told Ms. Faircloth that she didn't remember interviewing

plaintiff and "believed" that Mary Viveros and Dr. Tucker-Nevels interviewed plaintiff.  Doc.

61-3 at 15 (Faircloth Dep. 77:25–78:7).  Dr. Shaw's mere "belief"—and apparently an erroneous

one—described by Ms. Faircloth doesn't present a triable issue of pretext when the summary

judgment facts otherwise establish (through plaintiff's testimony and Dr. Shaw and Dr. Miguel's

Declarations) that they interviewed plaintiff.  And, even if Dr. Tucker-Nevels was involved in

the hiring decision, that doesn't create a jury question whether defendant's proffered reasons

were legitimate.

Fourth, plaintiff argues that defendant did not follow a policy to make a hiring decision

and instead, Superintendent Foust made the final decision.  To support this assertion, plaintiff

cites testimony from Kristen Scott, defendant's representative, asserting that "when Dr. Foust

became superintendent, he wanted a specific process followed to hire principals."  Doc. 61-2 at 2

(Scott Dep. 11:22–12:8).  And as a part of that process, he made the final decision.  *Id.*  The

summary judgment facts establish that Superintendent Foust had no knowledge of the events

that—according to plaintiff—defendant retaliated against her for when it made this hiring

decision.  Thus, Superintendent Foust's decision-making authority at the end of defendant's

hiring process raises no triable issue of pretext.

Fifth, plaintiff argues that she was more qualified than the other applicants for the job.

Plaintiff argues that for the following reasons she was more qualified than the successful

applicants:  (1) she made it to the third round of interviews; (2) she outscored two of the five

successful applicants; (3) she had successfully forged community relationships despite speaking English as her primary language; (4) she possessed elementary school experience; (5) she had 18 years of experience working for defendant; and (6) she had success in her position despite not being bilingual.  Doc. 61 at 110 (citing *id.* at 98–99 (¶¶ 131–139)).

Our Circuit has explained that it "'will draw an inference of pretext where the facts assure [the court] that the plaintiff is better qualified than the other candidates for the position.'"  *Hamilton v. Okla. City Univ.*, 563 F. App'x 597, 602 (10th Cir. 2014) (quoting *Santana v. City & Cnty. of Denver*, 488 F.3d 860, 865 (10th Cir. 2007)).  But, plaintiff can't establish a triable pretext issue by pointing to "'minor differences between plaintiff's qualifications and those of successful applicants[.]'"  *Conroy v. Vilsak*, 707 F.3d 1163, 1172 (10th Cir. 2013) (quoting *Santana*, 488 F.3d at 865).  Instead, "there must be 'an overwhelming merit disparity.'"  *Id.* (quoting *Santana*, 488 F.3d at 865) (affirming summary judgment against failure to promote claim where, among other things, plaintiff had failed to make a showing that she was more qualified); *see also Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211–12 (10th Cir. 2010) (explaining that "to suggest that an employer's claim that it hired someone else because of superior qualifications is pretext for discrimination rather than an honestly (even if mistakenly) held belief, a plaintiff must come forward with facts showing an overwhelming disparity in qualifications" and affirming summary judgment against failure to hire claim where successful applicant's qualifications "were . . . certainly not overwhelmingly inferior to" plaintiff's qualifications (citation and internal quotation marks omitted)).

The summary judgment facts here present no triable issue of pretext based on plaintiff's qualifications compared to those of any one of the five successful candidates.  Plaintiff's asserted success despite not speaking Spanish does not make plaintiff *more qualified* than a Spanish-

speaking candidate. The rest of her proffered reasons make plaintiff plausibly *as qualified* as the successful applicants, but none come close to showing an "overwhelming disparity" between her qualifications and those of the candidates that defendant hired.[14] Thus, plaintiff—through asserting she is more qualified than the successful candidates without presenting evidence to support her assertion—cannot create a triable issue on pretext for not being hired.

In sum, none of plaintiff's five pretext arguments highlight "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in defendant's proffered reasons. *See DePaula*, 859 F.3d at 970 (internal citation and quotation marks omitted). At best, plaintiff's argument shows that under her "subjective evaluation of the situation," she saw evidence of retaliation. *See id.* at 971. But the court must evaluate "'the facts as they appear *to the person making the decision* . . . .'" *Id.* (quoting *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011)). The summary judgment facts here show that, the employer "'honestly believed'" that the other candidates were more qualified than plaintiff and "'acted in good faith upon those beliefs.'" *Id.* (quoting *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007)). Thus, the court grants summary judgment against plaintiff's Title IX retaliation claim.

## C. Title IX retaliatory harassment claim

Finally, the court addresses plaintiff's final remaining claim, retaliatory harassment under Title IX. Again, the court applies the *McDonnell Douglas* burden-shifting framework. *Adcox*, 2017 WL 2405326, at *7 ("[A] review of Tenth Circuit case law mandates the conclusion that

---

[14]    To support her argument that she is more qualified than the other applicants, plaintiff asserts that she out-scored two of the five successful candidates on the Haberman evaluation. Doc. 61 at 110. The summary judgment evidence she cites to support this fact is "AF 132, Dep. Ex. 49" referring to Doc. 61 at 98 ¶ 132, which cites "Defendant's Ex. 49." Defendant's Exhibit 49 is a one-page email from Principal Skretta about the fire alarm issue. Doc. 49-49. It says nothing about applicant's scores. Thus, plaintiff hasn't shouldered her summary judgment burden "to support this assertion" by citing "to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A).

the Circuit, in the context of analyzing a retaliatory harassment claim, follows the *McDonnell Douglas* burden-shifting framework.") (first citing *Somoza*, 513 F.3d at 1212; then citing *Stover v. Martinez*, 382 F.3d 1064, 1070–75 (10th Cir. 2004); and then citing *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998)).

To establish a prima facie case of retaliatory harassment, a plaintiff must show that "(1) she engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) that a causal connection existed between the protected activity and materially adverse action." *Adcox*, 2017 WL 2405326, at *7 ("[B]ecause *Burlington Northern* applies to retaliation claims analyzed under the *McDonnell Douglas* framework, and the Circuit analyzes retaliatory harassment claims under that same framework, the court must apply—as the Circuit has—the relaxed adverse-action standard set forth in *Burlington Northern* as opposed to the stricter standard applied in *Harris* to discriminatory harassment claims.").

The court incorporates its conclusions from the Title IX retaliation analysis above. The first five allegations of Principal Skretta's cumulative behavior did not amount to materially adverse action—failing on the second prong to establish a triable issue on a prima facie case of her Title IX retaliatory harassment claim. The second five allegations of Principal Skretta's cumulative behavior present a triable issue on the second prong of the prima facie case but, for those actions, plaintiff fails to present a triable issue on pretext. The court also incorporates its findings from the Title IX retaliation analysis of Principal Skretta's formal letter of concern. Assuming that plaintiff can establish a prima facie case for the letter, defendant can show a legitimate, non-retaliatory reason for issuing the letter for the same reasons discussed above. And for the same reasons, plaintiff cannot adduce sufficient evidence to present a triable issue on

pretext.  Thus, the court grants summary judgment against plaintiff's Title IX retaliatory

harassment claim.

## IV.    Conclusion

For the reasons explained above, the court denies plaintiff's Motion to Amend or Modify

the Pretrial Order (Doc. 59) and the court grants defendant's Motion for Summary Judgment

(Doc. 48).

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Motion to

Amend or Modify the Pretrial Order (Doc. 59) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant's Motion for

Summary Judgment (Doc. 48) is granted in full as explained in this Order.

**IT IS SO ORDERED.**

**Dated this 9th day of December, 2022, at Kansas City, Kansas.**

                                    **s/ Daniel D. Crabtree**
                                    **Daniel D. Crabtree**
                                    **United States District Judge**